UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA,

      -against-                                18 Cr. 537(S1) (SHS)

JOHN TORTORA,

         Defendant.

-----------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF
JOHN TORTORA'S PRETRIAL MOTIONS**


Barry Levin, Esq.
100 Fairway Road
Lido Beach, NY 11561
Tel. 516-222-4500


Richard Levitt, Esq.
Levitt & Kaizer
rlevitt@landklaw.com
40 Fulton Street, 23rd Floor
New York, N.Y. 10038
Tel. 212 480-4000
rlevitt@landklaw.com

*Counsel for Defendant
John Tortora*


September 9, 2019

**Table of Contents**

Table of Authorities ...................................................................................iii

**I. All Evidence Seized Pursuant to the Several Searches Conducted in this
Case should be Suppressed** ...............................................................1

Introduction ...........................................................................................1

    **A. Statement of Facts**.....................................................................5

    **B. Mr. Tortora had a reasonable expectation of privacy in the business
located at 1 Saw Mill River Road, Yonkers, N.Y.** ...............................9

    **C. The evidence seized pursuant to the initial search warrant, and all fruits
thereof, should be suppressed because Detective Geiss's affidavit in support
of the warrant, considered together with the warrant itself, fails to establish
probable cause to believe evidence of the enumerated offenses would be
found on the Subject Premises**...........................................................11

        1. The Geiss Affidavit ........................................................12

            a. Evidence of the Ortiz Murder. .........................................12

            b. Evidence of other enumerated crimes................................12

        2. The Indictment ...............................................................16

    **D. The evidence seized pursuant to the initial search warrant, and all fruits
thereof, should be suppressed because the warrant was an unlawful general
warrant that violated the Fourth Amendment's particularity requirement....17**

    **E. The warrants to search the ESDs found on the subject premises violated the
Fourth Amendment because they were not sufficiently particularized,
particularly in light of the heightened concerns attendant to ESD searches ....21**

    **F. All evidence obtained as the fruit of the seizures of two cell phones taken
from Tortora's daughter at the time of Tortora's arrest, should be suppressed
as having been unlawfully seized** .......................................................27

    **G. The good faith exception to the exclusionary rule does not save the searches**.29

**II. The government should be required to provide additional discovery** ......................33

    **A. The government should be required to identify CS-1 and CW-1
and provide additional information relating to their credibility**......................33

**B**. **The government should be required to disclose the identity of the numerous persons interviewed by the police, as reflected in police reports provided to the defense, with respect to the Ortiz murder investigation as well as other requested discovery**................................................................36

**C**. **The government should be required to respond to questions asked in our letter dated June 5, 2019**........................................................................39

**III. The Court should Enter a Scheduling Order Consistent with the Volume of Discovery, the Seriousness of the Charges, the Number of Potential Witnesses and Exhibits, and the Anticipated Length of the Trial, to Permit Adequate Trial Preparation and to Assure the Efficient Conduct of the Trial** ........................................41

Conclusion .....................................................................................................................42

## Table of Authorities

**Cases**                                                                 **Page(s)**

*Aguilar v. Texas*, 378 U.S. 108 (1964) ...........................................................30

*Barrows v. Coleman*, 352 F. Supp. 2d 276 (D. Conn. 2005) ..............................28

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) .........................................24

*Franks v. Delaware,* 438 U.S. 154 (1978) ..............................................5, 28, 31, 35

*Giordenello v. United States*, 357 U.S. 480 (1958) ..........................................16

*Gombert v. Lynch*, 541 F. Supp. 2d 492 (D. Conn. 2008) ................................28

*Groh v. Ramirez*, 540 U.S. 552 (2004) .........................................................18, 23

*Illinois v. Gates*, 462 U.S. 213 (1983) ...................................................11, 14, 30

*Mancusi v. DeForte*, 392 U.S. 364 (1968) ......................................................10

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) ............................................10

*Maryland v. Pringle*, 540 U.S. 366 (2003) .....................................................11

*McCray v. Illinois*, 386 U.S. 300 (1967) .........................................................34

*Nathanson v. United States*, 290 U.S. 41 (1933) ............................................30

*New York v. Belton*, 453 U.S. 454 .................................................................28

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ......................................................10

*Rakas v. Illinois,* 439 U.S. 128 (1978) ..........................................................9, 10

*Rawlings v. Kentucky,* 448 U.S. 98 (1980) ......................................................9

*Riggan v. Virginia*, 384 U.S. 152 (1966) ........................................................30

*Riley v. California*, 134 S. Ct. 2473 (2014) .....................................................24

*Roche v. United States,* 614 F.2d 6 (1st Cir.1980)............................................18

*Roviaro v. United States*, 353 U.S. 53 (1957)...............................................33, 34

*United States v. Grant*, 18-cr-179 (DNJ) ......................................................41

*United States v. Blok*, 188 F.2d 1019 (D.C. Cir. 1951) ....................................10

*United States v. Cannone*, 528 F.2d 296 (2d Cir. 1975) .................................................................33

*United States v. Chadwick*, 433 U.S. 1 (1977)...............................................................................28

*United States v. Christine,* 687 F.2d 749 (3d Cir.1982) .............................................................18, 20

*United States v. Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) ........................................................31

*United States v. Cortez-Dutrieville*, 743 F.3d 881 (3d Cir. 2014) ..................................................10

*United States v. Fields*, 113 F.3d 313 (2d Cir. 1997) .....................................................................34

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ...........................................................21, 24, 25

*United States v. Ganias,* 824 F.3d 199 (2d Cir. 2016) ..............................................................24, 29

*United States v. Gomez*, No. 2018 WL 501607 (S.D.N.Y. Jan. 19, 2018) ......................................35

*United States v. Goode,* No. 2018 WL 919928 (S.D.N.Y. Feb. 15, 2018) ...................................34

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997) ......................................................................15

*United States v. Hamilton*, 538 F.3d 162 (2d Cir. 2008) .................................................................9

*United States v. Kirschenblatt*, 16 F.2d 202 (2d Cir. 1926) ..........................................................24

*United States v. Lefkowitz*, 285 U.S. 452 (1932) ...........................................................................10

*United States v. Leon,* 468 U.S. 897 (1984).............................................................................29, 30

*United States v. May*, 399 F.3d 817 (6th Cir. 2005) ......................................................................15

*United States v. Nosov*, 153 F. Supp. 2d 477 (S.D.N.Y. 2001) .......................................................33

*United States v. Price*, 925 F.2d 1268 (10th Cir. 1991)...................................................................10

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ..............................................................29

*United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) .................................................................16

*United States v. Saa*, 859 F.2d 1067 (2d Cir. 1988) .......................................................................35

*United States v. Salvucci,* 448 U.S. 83 (1980) ...............................................................................9

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)...............................................................18, 25

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982)............................................................34

*United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) .........................................................29

*United States v. Wecht*, 619 F. Supp. 2d 213 (W.D. Pa. 2009)......................................................32

*United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ...................................................23, 24

*United States v. Wilson,* 36 F.3d 1298 (5th Cir. 1994) ..................................................................11

*United States v. Zemlyansky,* 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ..............................18, 21, 23

*Utah v. Strieff*, 136 S. Ct. 2056 (2016) .........................................................................................29

*Villano v. United States*, 310 F.2d 680 (10th Cir. 1962) ..............................................................10

**Statutes and Other Authorities**

U.S. Const. amend. IV .......................................................................................................... passim

18 U.S.C. §  1951...............................................................................................................................6

18 U.S.C. §  1961 et seq.............................................................................................................16, 17

18 U.S.C. § 3500........................................................................................................................36, 41

18 U.S.C. § 3504(a)(1)....................................................................................................................40

21 U.S.C. §  846................................................................................................................................6

Fed. R. Crim. P.16.........................................................................................................................36

Fed. R. Crim. P.41 .........................................................................................................................11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                              18 cr 537(S1) (SHS)

JOHN TORTORA,

              *Defendant*.

---------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## JOHN TORTORA'S PRETRIAL MOTIONS

John Tortora is charged in the instant indictment with racketeering conspiracy (Count One); murder in aid of racketeering conspiracy (Count Two); murder for hire (Count Three); destroying evidence (Count Four); falsifying evidence (Count Five); and obstruction of an official proceeding (Count Six). The indictment also includes forfeiture allegations. This memorandum is in support of Mr. Tortora's pretrial motions (1) to suppress evidence; (2) for additional discovery; and (3) for a scheduling order requiring the timely disclosure of proposed 404(b) evidence; Jencks Act material; a witness list; and an exhibit list. The relevant facts are discussed in the points to which they correspond. We respectfully request a hearing upon these motions.[1]

**I.**   **All Evidence Seized Pursuant to the Several Searches Conducted in this Case should be Suppressed**

    **Introduction.** The government conducted numerous searches in the investigation of this case pursuant to several warrants, as a result of which thousands of pieces of evidence were seized, including documents, photographs, computer files, electronic storage devices, cell phones

---

[1] We respectfully request permission to file a 42-page memo of law, given our extensive citation herein to the affidavits in support of the numerous search warrants at issue in this case; which are not discussed in the accompanying brief declaration of counsel.

and more, at least some of which we anticipate the government will seek to introduce at trial. Specifically, we are aware of the following such warrants and searches:

**August 1, 2018 warrant to search 1 Saw Mill River Road, Yonkers, N.Y.**  On or about August 1, 2018, Assistant United States Attorney Jessica K, Fender applied for a warrant to search the premises identified as 1 Saw Mill River Road in Yonkers, New York (the "Subject Premises"), which houses certain business, including a pawn shop and check cashing service. The application was supported by an affidavit prepared by Yonkers Detective John Geiss, which incorporated an indictment (and related arrest warrant) that had been returned against John Tortora in the Southern District of New York charging a racketeering conspiracy (Count One), murder in aid of racketeering (Count Two), and murder for hire (Count Three). The application for this warrant, and the referenced indictment, are annexed as Exhibit A.

The ensuing warrant issued as a result of this application authorized a search of the Subject Premises for evidence relating to the aforementioned three crimes.  The warrant references an "Attachment A," which describes the Subject Premises, enumerates the specific crimes evidence of which could be seized (the "enumerated crimes"), and lists 14 categories of seizable evidence, including documents, cash, and other property such as artwork and gems. The warrant and attachments are annexed as Exhibit B.

The warrant was executed beginning the following day, August 2, 2018.

**August 2, 2018 warrant to search storage container**. On August 2, 2018, as the search of the Subject Premises commenced, the government applied for, and obtained, a warrant to search a storage container in the back of the 1 Saw Mill River Road premises. Execution of that warrant began shortly thereafter and continued apace with the execution of the August 1, 2018 warrant through August 4, 2018. The application for the August 2, 2018 warrant is annexed as

Exhibit C and the warrant, with attachments, is annexed as Exhibit D. (Together, we reference the August 1 and 2 warrants as the "primary warrants" and their joint execution as the "primary searches").

The items seized pursuant to the primary searches are included in the inventory annexed as Exhibit E.

**Warrants to search electronic storage devices**. During the execution of the primary warrants, numerous electronic storage devices (ESDs) were seized, which are identified in the annexed inventory (Exhibit E) as within containers 22-43 and 46-47. On November 20, 2018[1]

---

[1] The November 20, 2018 warrant sought permission to search the following ESDs:
    a. KT &C Model EZHD-TRFl 6 Hard Drive, Bearing Serial Number 534448634
    b. Model NRA00-64 Hard Drive, Bearing Serial Number 496746795
    c. HP Envy Computer, Bearing Seri?]. Number 8CQ74900BX
    d. HP Micro Server, Bearing Serial Number 5C7213POPV
    e. HP Computer, Bearing Serial Number 70312545
    f. HP Pavilion Computer, Bearing Serial Number 8CC80. 51B2B
    g. Dell Computer, Bearing Serial Number 50402980
    h. Dell Computer, Bearing Serial Number 5040297 4
    i. SonyVaio Computer, Bearing Serial Number 275461303000485
    j. Compaq Computer, Bearing Serial Number CNX9460J72.
    k. LG Computer, Bearing Serial Number 16103?10500284
    1. Computer (No Brand), Bearing Serial Number 1615C043800399
    m. Computer (No Brand), Bearing Serial Number 1 61 5C043800688
    n. HP Computer, Bearing Serial Number 2UA2240CVQ, with connected flash drive
    o. HP Computer, Bearing Serial Number 70312544
    p. USB Thumb Drive, assigned YPD voucher number 254180
    q. USB Thumb Drive, assigned YPD voucher number 254181
    r. USB Thumb Drive, assigned YPD voucher number 254182
    s. External Hard Drive, assigned YPD voucher number 254183
    t. External Hard Drive, assigned YPD voucher number 254185
    u. USB Thumb Drive, assigned YPD voucher number 254188
    v. USB Thumb Drive, assigned YPD voucher number 254189
    w. External Hard Drive, assigned YPD voucher number 254191
    x. Three Black and One Red Floppy Discs, assigned YPD voucher number 254615

and December 19, 2018,[2] the government applied for, and received, warrants to search these ESDs. From the ESDs, the government extracted and reviewed thousands of electronic files. The application for the November 20, 2018 warrant is annexed as Exhibit F and the corresponding warrant is annexed as Exhibit G. The application for the December 19, 2018 warrant is annexed as Exhibit H and the corresponding warrant is annexed as Exhibit I.

**Warrant to search cell phones.**  When Mr. Tortora was arrested at his home, on August 2, 2018, agents seized three cell phones. On January 10, 2019, the government applied for a warrant to search these phones.[3] The application for the January 10, 2019 warrant is annexed as Exhibit J and the corresponding warrant is annexed as Exhibit K.

_____

[2] As explained in Yonkers Detective John Geiss's affidavit in support of the December 19, 2018 warrant to search certain ESDs, his affidavit of November 20, 2018, and the warrant obtained pursuant to that affidavit, contained "an error in how the Original Business Electronics Warrant described the number of thumb drives relating to two Yonkers Police Department Vouchers. In particular, Voucher Number 254181 (originally listed as Item (A)(1)(q)) was described as referencing a single thumb drive, but in fact that voucher references 4 thumb drives; similarly, Voucher Number 254189 (originally listed as Item A(l)(v)), was described as referencing a single thumb drive, but in fact that voucher references 2 thumb drives. Accordingly, I am submitting this revised affidavit setting forth the correct description for the Subject Devices described on the relevant vouchers." Geiss Aff. at ¶ 10. We call upon the government to state whether the misidentified thumb drives were searched prior to the corrected warranted being issued.

[3] The cell phones searched pursuant to the January 10, 2019 warrant are identified in the warrant as:

    a.  A Samsung Galaxy S4, Model Number SPH-L720 UD containing a Sprint SIM Card No. 8901120 0000211774145;

    b.  A Samsung Galaxy Grand Prime, Model Number SMG530AZ UD containing a Cricket SIM Card No. 8901150327 8163002624; and

    c.  A Kyocera Phone, Model Number S2 l 51 Coast, having Mobile Equipment Identifier DEC No. 268 435 462 503 358 535 and Mobile Equipment Identifier HEX No. A00 000 413 33F 47, USA0 No. 2015R00447

As we discuss below, the aforementioned warrants were legally deficient because (1) the initial warrant, signed August 1, 2018, to search the 1 Saw Mill River Road premises was not supported by probable cause to believe that evidence of the enumerated crimes would be found at the Subject Premises, thereby rendering unlawful the primary searches as well as all subsequent searches as the fruits of the unlawful primary searches; (2) the initial warrant was an illegal general warrant, tainting all subsequent warrants as well. Additionally, it is likely the warrant application omitted material information regarding the criminal history and reliability of the two named informants, CW-1 and CS-1, requiring that a hearing be conducted pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978); (3) the warrants to search the Electronic Storage Devices were unlawful, not only because they were the fruit of the unlawful primary warrants, but also because they were not sufficiently particularized; and (4) the seizure of the two cell phones seized at the time of Mr. Tortora's arrest, which were not taken from his person, were unlawful as without warrant.

### A. Statement of Facts

All searches in this case were the fruit of the primary searches, conducted August 2-4, 2018, of the commercial premises located at 1 Saw Mill River Road, Yonkers and a storage shed behind the premises. As stated in Mr. Tortora's affidavit (Exhibit L), he was, at the least, the manager of the businesses located at this location, was responsible for the businesses' day-to-functioning, and had authority to permit persons to enter and remain on any and all parts of the premises or to exclude persons therefrom. As such he had a reasonable expectation of privacy in those premises.

Detective Geiss's exceedingly brief (10-page) affidavit in support of the August 1, 2018 warrant to search 1 Saw Mill River Road (Exhibit A), relates the facts upon which the

government relied in support of the initial warrant, including reference to a then-sealed Indictment of John Tortora that had previously been returned by a grand jury in the Southern District of New York. Broadly, the indictment – since superseded -- charged Mr. Tortora with "involvement" in specific crimes related to the Genovese Crime Family in which Tortora is claimed to be an "associate" and/or a "member." Geiss Aff.  ¶¶ 7-9.[4]

In his affidavit, Detective Geiss alleges that "TORTORA owns and operates various businesses out of the Subject Premises, including, among others, entities registered to do business under the names 'Page Tone Inc.'; ''Westchester Check Cashing Inc.'; 'Westchester Pawn & Trade LLC'; and/or 'Yonkers Jewelry Outlet, Inc.,' and that TORTORA has operated out of the Subject Premises since at least 1994." *Id*. at ¶ 13.

---

[4] The indictment charged Mr. Tortora with a racketeering conspiracy relating to his alleged association with La Cosa Nostra (Count One); the November 11, 1997 murder of Richard Ortiz in aid of the racketeering alleged in Count One (Count Two); and the murder for hire of Richard Ortiz (Count Three). Count One alleged a pattern of racketeering activity consisting of:

    a. Multiple acts chargeable under state law and punishable by imprisonment for more than one year involving:
        i. Murder, in violation of New York Penal Law Sections 20.00, 105.15, 110.00, and 125.25;
        ii. Robbery, in violation of New York Penal Law, Sections 20.00, 105.15, 110,00, 160.05, 160.10, and 160.15;
        iii . Extortion, in violation of New York State Penal Law, Sections 20.00, 110.00, 105.10, 155.40, and 150.05;
        iv. Illegal gambling, in violation of New York State Penal Law, Sections 20.00, 225.10, and 225.10.
    b. Multiple acts indictable under the following provisions of federal law:
        i. Title 18, United States Code, Section 1951 (relating to interference with commerce, robbery, or extortion);
        ii. Title 18, United States Code, Sections 892, 893, and 894 (relating to extortionate credit transactions);
        iii. Title 18, United States Code, Section 1955 (relating to the prohibition of illegal gambling businesses);
        iv. Multiple offenses involved trafficking in controlled substances in violation of Title 21, United States· Code, Sections 841 and 846.

According to CS-1, a paid informant, the businesses named in Detective Geiss's affidavit are nominally owned by persons other than Tortora to "shield the assets TORTORA has acquired as a result of his racketeering activities." *Id*. at ¶ 14. CS-1 also alleges that Tortora uses the Subject Premises to conduct various criminal activities, including loansharking, collecting gambling debts, laundering stolen and fraudulent checks, as well as buying and selling stolen jewelry. *Id*. at ¶ 17. CS-1 further claims that Tortora has used the Subject Premises as a location at which to meet with other members of La Casa Nostra, "including TORTORA's current 'Captain,' Danny Pagano." *Id*. at ¶ 18.

Detective Geiss continues that he learned in or about October 17, 2017, that Pagano and Genovese captain, Salvatore Gigante, visited the Subject Premises and met with Tortora. A grand jury subpoena was served on Westchester Check Cashing at the Subject Premises for video footage for the relevant date, but counsel for Westchester Check Cashing "advised that the video was no longer available as a result of an alleged update to the surveillance system." However, "Pagano's probation officer … confirmed that Pagano had confessed to the probation officer that Pagano visited the Subject Premises at the date and time in question, although Pagano claimed to be there in order to pass out his business cards." Geiss Aff. ¶ 19.

CW-1 (not to be confused with CS-1)—who was cooperating pursuant to his guilty plea, and who allegedly "assisted TORTORA with his racketeering activities in the mid-1990s, and who participated in the Ortiz Homicide" as charged in the indictment—stated that Tortora met with La Cosa Nostra members at the Subject Premises during that time period. *Id*. at ¶ 20. CW-1 further stated that CW-1 delivered racketeering proceeds to Tortora at the Subject Premises in or around 1996 and 1997, and that Tortora also discussed with CW-1 and others the Ortiz homicide prior to its occurrence. *Id*.

7

On or about June 19, 2018, Yonkers Police officers visited the Subject Premises, where they observed bags of jewelry, including gold and diamonds. *Id*. at ¶ 21. Mr. Tortora reportedly told the officers, "These diamonds are currency. This is my retirement. You can't leave the country with money, but you can leave the country with diamonds." *Id*. at ¶ 21.

Based on Geiss's initial affidavit, the Indictment annexed thereto, and, thereafter, a second affidavit, the aforementioned warrants to search the Subject Premises (including both the business location and the aforementioned storage facility) were issued and executed, between August 1 and 4, 2018.

The consolidated inventory for the two searches reflects the seizure from the Subject Premises of some 340 containers, labeled from 15 through 354,[5] including

- 6 containers (15-20) labeled "Money"

- 1 container (21) labeled "Counterfeit Money"

- 23 containers (22-33, 35-43, 46-47) labeled as various "computer hardware" including DVR players, printers, CPUs, computers, and various electronic storage devices such as thumb drives and external hard drives

- a handgun (44)

- a holster (45)

- 254 containers (48-302) labeled "jewelry/precious metals"

- 50 containers (303-353) labeled "personal papers/identification"

- one container (354) marked "8 Keys and Metal Belt Clip… Removed from Suspect"

*See* Exhibit E.

---

[5] Containers 1-14 contain evidence seized elsewhere.

Using the information contained in the affidavits in support of the warrants to search 1 Saw Mill River Road, information gleaned from the execution of those warrants and additional investigation, the aforementioned warrants to search the ESDs seized during the search of the Subject Premises were issued. Additionally, a warrant was obtained to search the three cell phones seized when Tortora was arrested at his home on August 1, 2018.

### B. Mr. Tortora had a reasonable expectation of privacy in the business located at 1 Saw Mill River Road, Yonkers, N.Y.

As stated by Mr. Tortora in his accompanying affidavit (Exhibit L) he was, at the least, the manager of each of the businesses located at 1 Saw Mill River Road, N.Y., the Subject Premises. In that capacity, he states he "was ultimately responsible for the day-to-day running of the businesses. I had both the authority and responsibility to determine, with respect to all locations within that address, who may be present and who may be excluded." This supervisory authority over the premises, together with the absolute right to permit persons to enter and remain, or to exclude persons from the premises, gave him a reasonable expectation of privacy therein.[6]

The ultimate issue in standing analysis is whether the defendant had a "reasonable expectation of privacy" in the area searched. *United States v. Salvucci*, 448 U.S. 83 (1980); *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Mr. Tortora unquestionably had an expectation of privacy in the Subject Premises, as there is no reason to question the truth of his sworn statement, which makes clear that he had such an expectation, *see United States v. Hamilton*, 538 F.3d 162, 168 (2d Cir. 2008) ("While the burden was on Hamilton to establish a protected privacy interest, the court was obligated to credit the

---

[6]     We note that Mr. Tortora suffered a stroke in 2013. He thereafter returned to work and remained WCC's manager throughout the pertinent period, albeit working somewhat less hours on-premises.

facts he asserted, and could not properly deny his motion for lack of standing unless the facts he asserted, seen in the light most favorable to Hamilton, were legally insufficient to sustain his burden"), and that expectation was a reasonable one. He could, for example, exclude anyone and everyone from the premises and, literally, shutter the doors if he chose to do so; this total authority to exclude others itself establishes his standing. When a defendant's relationship to searched premises is such that he "could legitimately expect privacy in the areas which were the subject of the search and seizure [that he seeks] . . . to contest," he is entitled to challenge the legality of a search and seizure. *Rakas*, 439 U.S. at 149.

Given Mr. Tortora's status as unquestioned supervisor of the premises, and his absolute right to exclude persons from any and all places therein, his expectation of privacy within the entire premises was reasonable no less than would be an employee's expectation of privacy in his "office" or a person's expectation of privacy in his home. Yet, an employee has standing to contest the search of his office or work area, even if it is shared with other employees. *O'Connor v. Ortega*, 480 U.S. 709, 714-19 (1987) (a public employee's office); *see also United States v. Lefkowitz*, 285 U.S. 452 (1932) (a business office); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311-15 (1978) (employees' work areas in a factory building); *Mancusi v. DeForte*, 392 U.S. 364 (1968) (a union office shared by defendant and other union officials); *Villano v. United States*, 310 F.2d 680 (10th Cir. 1962), limited on other grounds, *United States v. Price*, 925 F.2d 1268 (10th Cir. 1991) (an employee's desk in a retail store); *United States v. Blok*, 188 F.2d 1019 (D.C. Cir. 1951) (an employee's desk in a government office). And, of course, a homeowner – *or even an overnight guest in someone else's home* -- has standing to contest a search within the home. *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (*quoting Minnesota v. Olson,* 495 U.S. 91, 96-97 (1990) ("Generally, a person's 'status as an overnight guest is alone

enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable,'"). Even a guest in someone else's *hotel room* has standing to contest a search of the premises. *United States v. Wilson*, 36 F.3d 1298, 1303 (5th Cir. 1994). In many such cases the employee has standing, notwithstanding that his employer may ultimately exclude him from the premises, or an overnight guest has standing even though the homeowner can exclude *him*; Mr. Tortora had far more authority over the entire premises – including the unfettered right to exclude others -- than such employees have over their personal offices or an overnight guest has over a home. Therefore, he had a protectable privacy interest in the Subject Premises.

### C. The evidence seized pursuant to the initial search warrant, and all fruits thereof, should be suppressed because Detective Geiss's affidavit in support of the warrant, considered together with the warrant itself, fails to establish probable cause to believe evidence of the enumerated offenses would be found on the Subject Premises

A warrant may only issue upon a showing of probable cause. Fed. R. Crim. P. 41(d)(1). The Supreme Court has described "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." *Id.* When assessing probable cause, the court must evaluate the "totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Here, the sufficiency of the warrant, as it relates to the probable cause requirement, turns on whether the Geiss affidavit, considered together with the indictment, establishes probable cause to believe that evidence of the enumerated offenses listed in Attachment A to the warrant, i.e. murder, robbery, extortion, illegal gambling, extortionate credit transactions and drug

trafficking, would be found on the premises. Because the relevant documents fail to establish probable cause to believe evidence of the indicted crimes would be found in the Subject Premises, the Court should suppress all fruits of the searches.

### 1. The Geiss Affidavit

a.   <u>Evidence of the Ortiz Murder</u>. The only discussion in the Geiss affidavit regarding the Ortiz murder is its representation that, according to CW-1, who admitted participating in the murder, "Tortora met with CW-1 and other members of La Cosa Nostra at the Subject Premises to discuss the Ortiz murder prior to the murder." Geiss Aff. ¶ 20. CW-1 does not suggest that even at the time of the murder – 1997 – evidence of the murder could have been found at the Subject Premises, much less that such evidence could be found there 21 years later when the warrant was executed. Detective Geiss's affidavit, therefore, does not support the warrant's finding of probable cause to believe evidence of the Ortiz murder would be found on the Subject Premises.

b.   <u>Evidence of other enumerated crimes</u>. Nor does the Geiss affidavit support the warrant's finding that evidence of the other crimes, identified in the warrant, would be found on the Subject Premises. Certainly, CW-1's asserted representation that he delivered proceeds of racketeering activity to Mr. Tortora at the Subject Premises on "multiple occasions in or around 1996 and 1997" does not support the conclusion – even if CW-1 was reliable –that these proceeds would remain on the premises *in 2018*.

Nor is probable cause provided by CS-1, the paid informant. According to the Geiss affidavit, CS-1 informed law enforcement authorities that Mr. Tortora uses the Subject Premises to conduct various criminal activities, including loansharking, collecting gambling debts, laundering stolen and fraudulent checks, and buying and selling stolen jewelry. Geiss Aff. ¶ 17.

CS-1 further asserts that Mr. Tortora has used the Subject Premises as a location at which to meet with other members of La Casa Nostra, "including TORTORA's current 'Captain,' Danny Pagano," Geiss Aff.  ¶ 18. Pagano, moreover, supposedly admitted to his Probation Officer that he visited the Subject Premises, though he said he did so to pass out his business cards. Geiss Aff. ¶ 19.

Pagano's visit to the Subject Premises, of course, does not establish probable cause to believe that Mr. Tortora was committing any crimes, let alone the enumerated crimes; at most it supports a finding that Mr. Tortora and Pagano know one another.

Whether CS-1's assertion that Tortora uses the Subject Premises to conduct the enumerated crimes establishes probable cause for the search turns on an assessment of CS-1's credibility and reliability, which is viewed under the totality of the circumstances.

Here, CS-1 is alleged to be credible and reliable for the following reasons:

> CS-1 is a signed up source with the Federal Bureau of Investigation1 who provides information on the activities of members and associates of La Cosa Nostra in exchange for financial compensation. The information provided by CS-1 has been proven reliable, in that it has been corroborated by other cooperating witnesses and confidential sources, recorded conversations, surveillance, and telephone records.

Geiss Aff. p.6 fn.1.

This stick-thin statement provided no basis  for the magistrate to have determined that CS-1 is credible and his information reliable, but rather states, entirely in conclusory form, that he has "been proven reliable" and "has been corroborated." In particular, it

1. fails to identify CS-1 by name;

2. states that CS-1 is providing his information for money, thus providing him a motive to lie, and fails

    a.   to state how much he has received thus far and how much he expects to receive in the future for his work on this case;

    b.   to explain whether the compensation he has received was for information he provided in this case or another case;

    c.   to provide the terms of his agreement with law enforcement, if any, by which he is compensated;

3.   fails to state whether the information he has provided that has been supposedly "proven reliable"

    a.   concerns this or another case;

    b.   concerned matters that only a person with "inside" information would know or was publicly available;

    c.   concerned matters of an inculpatory nature as opposed to neutral facts

4.   fails to state whether law enforcement officials have ever determined CS-1's information to be *inaccurate* or *unreliable*; and

5.   fails to state whether CS-1 has prior convictions, particularly ones for dishonesty.

Courts have considered the following factors, among others, relevant to assessing law enforcement's representations regarding the reliability of an informant's information:

- Whether the affiant's representation that the informant has been proven reliable includes *specific information* from which the issuing magistrate can assess the truthfulness and significance of such assertions. *See Illinois v. Gates*, *supra*, 462 U.S. at 239 ("[a]n officer's statement that '[a]ffiants have received reliable information from a credible person and do believe' that heroin is stored in a home, is … inadequate") (emphasis added).

Here, Detective Geiss' representation that CS-1's information has been proven reliable, and has been corroborated, is nothing more than a bald assertion, lacking any means to assess its accuracy or significance.[7]

- "An informant's tip is considered to have greater reliability, and therefore to be more supportive of a finding of probable cause, if the affidavit avers that the name of the confidential informant has been disclosed to the issuing judge." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005).

  Here, nothing in the discovery we have received reflects that CS-1's true name was disclosed to the issuing judge.

- Whether the government has provided the issuing magistrate information regarding the informant's criminal history. *See, e.g.*, *United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) (affirming the suppression of evidence where officer failed to disclose that informant had conviction for falsely reporting a crime and informant's information was basis for probable cause determination).

  Here, the Geiss affidavit fails to address CS-1's criminal history, if any. Indeed, because CS-1's identity is unknown to the defense, we do not know whether Detective Geiss withheld any such criminal history from the issuing magistrate. However, on information and belief, *CW-1* does have a criminal history (in addition to his plea to federal charges referenced at p.8 fn 2 of the Geiss Affidavit), which Detective Geiss

---

[7] Obviously, information provided by a source of a mundane and/or public nature, *e.g.,* the address at which a target lives, would hardly support a finding that the informant was reliable with respect to claims that evidence of particular crimes would be found at a particular location, yet Detective Geiss provides no information from which the magistrate who signed the warrant could discern whether the information from CS-1 that was supposedly "corroborated" by other sources was of the type that substantially supported a finding that the Subject Premises contained evidence of crime.

failed to disclose; therefore, we have a good faith basis to believe that CS-1's criminal history may likewise have been withheld.[8] Of course, particularly relevant would be crimes involving dishonesty and fraud, which, independently, could be a basis for discrediting an informant. *See, e.g.*, *United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) ("Any crime involving dishonesty necessarily has an adverse effect on an informant's credibility. In the absence of countervailing evidence to bolster the informant's credibility or the reliability of the tip, an informant's criminal past involving dishonesty is fatal to the reliability of the informant's information, and his/her testimony cannot support probable cause.").

- What agreement, if any, exists between the government and the informant regarding the informant's cooperation and his compensation? What, if anything was the informant paid or promised relating to the information attributed to him in the affidavit?

    Here, no details regarding the government's agreement with CS-1, or the compensation he has received or been promised, is disclosed by Detective Geiss in his affidavit. Clear from the foregoing is that the information attributable to CW-1 and CS-1 fails to establish provide probable cause for the issuance of the initial warrants.

**2.  The indictment**

The indictment returned against Mr. Tortora, which was incorporated into Detective Geiss's affidavit, does not supply the missing probable cause to believe that evidence of the enumerated crimes would be found at the Subject Premises. The return of an indictment presumptively establishes probable cause to believe the named defendant committed the charged

---

[8] On information and belief, CW-1 was charged by New York State, in 2009, with enterprise corruption, bribery, bribe receiving, extortion, narcotics and firearms trafficking, and illegal gambling.  He eventually pleaded guilty to reduced charges.

Case 1:18-cr-00537-SHS   Document 70   Filed 09/09/19   Page 23 of 48

crimes. *Giordenello v. United States*, 357 U.S. 480, 487 (1958). Thus, the indictment against Mr. Tortora, presumptively, established probable cause to believe Mr. Tortora committed the crimes of RICO conspiracy (Count One); murder in aid of racketeering (Count Two); and murder for hire (Count Three). *But the indictment provides no reason to believe that Mr. Tortora himself, rather than another alleged member of the charged enterprise, actually committed the enumerated offenses.* On the contrary, the indictment alleges only that Mr. Tortora "agreed that a conspirator would commit at least two [of the identified] acts of racketeering activity in the conduct of the affairs of the Enterprise." Indictment ¶ 12. Thus the indictment provides probable cause only to believe that Mr. Tortora was personally involved in some part of the Ortiz murder, which occurred some 21 years previous, and that he is guilty of RICO conspiracy—*but not that he personally committed any of the charged racketeering acts*.

Since the indictment does not allege that Mr. Tortora personally committed the enumerated offenses, *the indictment provides no reason to believe that evidence of such offenses would be found on the Subject Premises, as the grand jury was not required to make such a finding*. Thus, any finding that evidence of the enumerated offenses would be found on the Subject Premises is dependent on the allegations in the Geiss Affidavit, which, as discussed previously, are insufficient to support such a conclusion.

**D. The evidence seized pursuant to the initial search warrant, and all fruits thereof, should be suppressed because the warrant was an unlawful general warrant that violated the Fourth Amendment's particularity requirement**

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It mandates that "no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." *Id.*

The requirement that warrants particularly describe the things to be seized has a number of purposes. First, it provides "written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned." *Groh v. Ramirez*, 540 U.S. 551, 560 (2004); *see also United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010). Second, it prevents "general searches" by confining the discretion of officers and authorizing them to seize only particular items. *Tracey*, 597 F.3d at 146.  Third, it "informs the subject of the search 'of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'" *Id.* (quoting *Groh*, 540 U.S. at 561). *See also United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017); *United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) (warrant to search defendant's business lacked requisite particularity under Fourth Amendment).

Consistent with the foregoing rules, a warrant will be condemned as authorizing a general search if it suffers from either of two related infirmities. First, a warrant can define the crimes under investigation so broadly that it authorizes agents to search for evidence of virtually any crime, which is "no limitation at all." *Roche v. United States*, 614 F.2d 6, 8 (1st Cir.1980) (*citing In re Application of Lafayette Acad., Inc.*, 610 F.2d 1 (1st Cir. 1979)). Second, the warrant's enumeration of the categories of property that may be seized may "vest the executing officer with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir.1982). The instant warrant suffers from both infirmities.

A review of the warrant signed in this case reveals that it authorized a search for "any crime proceeds," without regard to whether the "crime" was one of those enumerated in the

warrant. Further, it authorized the seizure of any assets "owned in whole or in part by Tortora"

regardless whether there was probable cause to believe said assets were evidence of a crime for

which probable cause had been established. In particular, the face of the warrant references

"Attachment A" as describing the property that may be seized during the authorized search.

Included within the 14 categories are the following:

> 11. Documents and other evidence of the ownership and value of the Subject Premises *and any other assets owned in whole or in part by TORTORA*;

> 12. Documents and other evidence reflecting TORTORA's employment or other means of obtaining income, including but not limited to, loan applications and personal tax returns;

> 13. *Cash or monetary instruments in excess of $1,000*;

> 14. Works of art, loose diamonds or other precious or semiprecious gems, precious metals, and luxury jewelry, believed to be have an estimated value of at least $5,000, *any documentation relating to such items of value, and any other suspected crime proceeds or documentation thereof*, such as information pertaining to safe deposit boxes or the location of other funds, items of value, and bank accounts.

(emphasis added).

By authorizing the wholesale seizure of any and all evidence of the "ownership and value

of… any … assets owned in whole or in part by" Mr. Tortora, the agents were authorized to

seize anything of value within the store, *regardless whether such evidence was evidence of the

enumerated crimes*, as the government's theory of this case is that Mr. Tortora owns the store

located at the Saw Mill River Road premises.

By authorizing the seizure of documents reflecting Mr. Tortora's "employment or other

means of obtaining income" the warrant authorized the agents to seize virtually every document

on the premises, *regardless whether such documents were evidence of the enumerated crimes*,

since the premises housed several businesses including a pawn shop and a check cashing service.

In fact, the great bulk of the documents on premises reflected the other businesses thereat.

By authorizing the seizure of monetary instruments in excess of $1,000, the warrant authorized the agents to seize virtually all cash and cash equivalents on the premises, *regardless whether there was evidence connecting the cash to the enumerated criminal conduct*.

By authorizing the seizure of art, gems and jewelry, with an estimated value of at least $5,000, and related documentation, the warrant authorized the seizure – from a pawn shop, no less – of these items *regardless whether they were evidence of the enumerated criminal conduct*.

By authorizing the seizure of "any other suspected crime proceeds or documentation thereof," the warrant authorized the agents, *at their complete discretion*, to seize anything they suspected was evidence of crime proceeds and related documentation, *regardless whether or not such proceeds or documentations related to an enumerated crime*. In this sense, the warrant was so all encompassing as to "vest the executing officer with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir.1982).

These broad categories of permitted seizures are precisely of the sort that consistently have been condemned in the case law. As Judge Oetken explained in *Zemylansky*, *supra*:

> The Tri–State warrant allows for the seizure of categories of materials that other courts have recognized to be impermissibly broad. For instance, it covers "[c]hecks, cash, and other financial instruments" without indicating any individuals, entities, offenses, time frame, or relevance. *See United States v. Gigante,* 979 F.Supp. 959, 966–67 (S.D.N.Y. 1997) (describing as "broad and vague" a warrant item authorizing seizure of all "financial, banking, safe deposit, investment, asset, tax, bookkeeping, and accounting records—along with underlying, supporting, and related documentation—of or referring or relating to [certain individual and entities]" where the warrant did not adequately specify to whom or what these items had to relate). The warrant also reaches all "calendars and patient appointment records," without any indication of which calendars, which patients, which doctors, or which clinics were under investigation. *See United States v. Lazar,* 604 F.3d 230, 238 (6th Cir. 2010) (evaluating a warrant permitting the seizure of all patient records from two

medical offices and finding that "[a]s regards records of patients whose names did not appear on a patient list presented to the issuing Magistrate Judge, the facts of this case ... require suppression of those files. This facial deficiency was so evident, moreover, that no officer could reasonably presume the warrants valid"); *United States v. SDI Future Health, Inc.,* 568 F.3d 684, 705 (9th Cir. 2009) ("Category 24—SDI's rolodexes, address books, and calendars—amounts to the laziest of gestures in the direction of specificity ... this category practically begs the search team to find and to seize the contact information of every person who ever dealt with SDI."). By the same token, in referring to "[l]edgers documenting patient medical treatment, tests provided, and other records related to patient care," the Tri–State warrant authorizes the officers to search through and seize virtually any such document in the office, with no limitation as to offense, patient, time period, clinic, or doctor.

*United States v. Zemlyansky*, 945 F. Supp. 2d at 457–58.

### E. The warrants to search the ESDs found on the subject premises violated the Fourth Amendment because they were not sufficiently particularized, particularly in light of the heightened concerns attendant to ESD searches

The arguments made thus far demonstrate that the initial warrants should not have issued and that the seizure of all evidence found on the premises during the primary searches was therefore unlawful. Suppression of the ESDs found during the primary searches is required for the additional reason that the separate warrants issued to search the ESDs, following their initial seizure from the subject premises, were unlawfully authorized, both because those warrants suffered from many of the infirmities as did the warrants to conduct the initial searches but also because warrants to search ESD's are subject to higher scrutiny. *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) ("Where, as here, the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance. As numerous courts and commentators have observed, advances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain.").

The lawfulness of the warrants discussed herein include the two warrants that authorized the searches of various electronic storage devices (computers, thumb drives and hard drives) found at 1 Saw Mill River Road, as well as a third warrant to search three cell phones seized at the times of Mr. Tortora's arrest, *i.e.*:

- November 20, 2018 warrant to search several computers, hard drives and USBs (Exhibit F)

- December 19, 2018 warrant to search a total of 6 USB devices (Exhibit I)

- January 10, 2019 warrant to search three cell phones (Exhibit K)

The November 20 and December 19, 2018 warrants authorized searches for 14 identical categories of evidence. The warrant to search the three cell phones (Exhibit K) authorized searches for 16 categories of evidence. The warrants authorizing the searches of these electronic devices contain no instructions unique to searching ESDs to guide the discretion of the agents conducting these sensitive searches, but rather, like non-ESD warrants, simply authorize the search of the devices for the enumerated categories of evidence. Although the affidavits in support of the warrants contain very minimal guidance regarding how the ESD searches would be conducted (under the heading, "Procedures for Searching ESI,"),[9] those affidavits are not

---

[9] For example, Exhibit H – the affidavit in support of the December 19, 2018 warrant -- provides:

               A.    Review of ESI

        13.    Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney. support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Devices for information responsive to the warrant.

        14. In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

incorporated into the warrant, are therefore are not part thereof, and cannot be ascribed any limiting effect on the warrant. *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453 (S.D.N.Y. 2013) ("supplementary documents, including affidavits submitted to a magistrate judge to demonstrate probable cause, can particularize a warrant *only* if attached and incorporated into the warrant by reference.") (emphasis in original);[10] Moreover, not only do the warrants fail to incorporate this minimal guidance, they instead state, broadly, in the section of each warrant

---

- surveying directories or folders and the individual files they contain. ( analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);
- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents ( analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);
- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and
- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

15. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Devices to locate all data responsive to the warrant.

[10] *See also United States v. Wey*, 256 F. Supp. 3d 355, 381–82 (S.D.N.Y. 2017):

a court may construe a warrant with reference to a supporting application or affidavit only "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." [*Groh v. Ramirez*, 540 U.S. 552, 557–58 (2004)]. And, as the Second Circuit has concluded, "for an attached affidavit properly to be incorporated into a warrant, the warrant must contain 'deliberate and unequivocal language of incorporation'"—"[l]anguage in a warrant that simply references an underlying affidavit" does not suffice. *650 Fifth Ave.*, 830 F.3d at 99-100 (*quoting United States v. Walker*, 534 F.3d 168, 172–73 & n.2 (2d Cir. 2008) (*per curiam* ))*; see also Rosa*, 626 F.3d at 64 (recognizing that after *Groh*, courts "may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant").

titled "Review of ESI on the Subject Device," that "Law enforcement personnel … are authorized to review the ESI contained on the Subject Devices for the following evidence…"

The special privacy concerns inherent in searching ESDs have been emphasized in several recent Supreme Court decisions, including *Riley v. California*, 134 S. Ct. 2473 (2014), where the Court pointedly stated:

> In 1926, Learned Hand observed (in an opinion later quoted in *Chimel*) that it is "a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *United States v. Kirschenblatt,* 16 F.2d 202, 203 (C.A.2). If his pockets contain a cell phone, however, that is no longer true. Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

*Riley*, 134 S.Ct. at 2490–91. *See also Carpenter v. United States*, 138 S. Ct. 2206, 2214, (2018).

The Second Circuit, as in *Galpin*, *supra*, has repeatedly expressed similar concerns, recognizing that the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (*en banc*).

As Judge Nathan observed in *United States v. Wey*, prior to suppressing fruits of an analogous computer search—a warrant authorizing a search of a hard drive presents a particular problem insofar as during the search of the hard drive, the government can claim its contents are in plain view, which opens the door to "every warrant for electronic information [becoming], in effect, a general warrant rendering the Fourth Amendment irrelevant." *United States v. Wey*, 256 F. Supp. 3d 355, 383 (S.D.N.Y. 2017), quoting *Galpin,* 720 F.3d at 447 (quoting in turn *United*

24

*States v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1176 (9th Cir. 2010)) (*en banc* ) (*per curiam*).

Of course, different factual settings require different approaches for warrants to search ESDs. Thus, although a "heightened sensitivity to the particularity requirement in the context of digital searches" is necessary, *Galpin, supra,* 720 F.3d at 447, the Second Circuit has been more forgiving of broadly worded warrants to search ESDs where the business targeted by the warrant is, essentially, computer-based and the crimes under investigation are expected to utilize those computers. Such was the case, e.g., in *United States v. Ulbricht*, *supra*, 858 F.3d at 102 (targeting the "Silk Road" Dark Web website of "Dread Pirate Roberts"), where the circuit panel observed, "Operating Silk Road involved using sophisticated technology to mask its users' identities."

Nothing in the affidavits in support of the ESD warrants, however, suggested that Mr. Tortora was a sophisticated computer user. In fact, nothing in the warrants even provided probable cause to believe he used his ESDs for improper purposes. Thus, rather than scrupulously protect Mr. Tortora's Fourth Amendment rights, the warrants that were issued to search the ESDs seized from 1 Saw Mill Road imposed virtually no meaningful limitation on the ensuing searches and seizures. In particular those warrants, issued November 20 (Exhibit G) and December 19, 2018 (Exhibit I), and on January 10, 2019 (three cell phones, Exhibit K), include many of the same categories of impermissible searches as did the August 1 and 2 warrants to search the Subject Premises. Thus the warrants of November 20 and December 19, 2018,[11] authorized searches, without limitation of:

---

[11] The cell phone warrant of January 10, 2019 contains similar language, but adds certain paragraphs authorizing the seizure of files unique to cell phones, *e.g.*, "Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices" (¶ 1).

- All documents and other evidence relating to the ownership and management of any business associated with or using the address of the Building (¶ 1)

- All documents and other evidence relating to the operation of any business associated with or using the address of the Building (¶ 2)

- All documents and other evidence of the relationships between co-conspirators involved in the Subject Offenses (¶ 8)

- All documents and other evidence of any corporate entities associated with TORTORA or other individuals believed to be associated with organized crime or La Cosa Nostra (¶ 10)

- All documents and other evidence of the ownership and value of the Subject Premises and any other assets owned in whole or in part by TORTORA (¶ 11)

- All documents and other evidence reflecting TORTORA's employment or other means of obtaining income, including but not limited to, loan applications and personal tax returns (¶ 12)

These, and other of the enumerated paragraphs of the warrants, authorized nothing less than a wholesale rummaging through all the seized ESDs, permitting agents to read every file on every ESD and to seize any and all documents relating to: the ownership, management, and operation of every business on the premises regardless whether they were involved in crime; the relationships between as-yet unnamed persons the agents *personally believed* were "co-conspirators" in the "Subject Offenses"; all documents of the ownership and value of the Subject Premises and of all Mr. Tortora's assets *regardless whether they were related to the Subject Crimes or any crimes at all*; all evidence of Mr. Tortora's employment, assets and income *regardless whether such employment, assets, and income were related to the Subject Offenses, or any offenses at all*. Essentially, the government wrote the warrant to provide it a patina of limiting effect while in fact authorizing the agents to review every single document and seize virtually every such document, since virtually all documents found on the ESDs would necessarily relate to the businesses, their ownership, their assets, their value and Mr. Tortora's

26

employment, assets and income. Yet probable cause had not been established to permit such broad seizures: *Nothing* in the affidavits in support of the warrants established that criminality within the businesses located on the Subject Premises was so pervasive as to justify such all-encompassing searches and seizures of the ESDs. On the contrary, the affidavits merely suggest, *in the most conclusory of fashion* and based principally on the sweeping claims of CS-1, that:

> TORTORA uses the Building to, among other things, engage in loansharking and to collect payments on extortionate loans; to collect on gambling debts owed to members and associates of La Cosa Nostra as a result of an illegal overseas online sports gambling business; to assist in "washing" stolen or fraudulent checks for a large fee; and to negotiate the purchase and sale of stolen jewelry. CS-1 has reported that TORTORA maintains records relating to his various businesses in a safe, which is located in the back office area of the Building.

Thus, the ESD warrants suffer from many of the same constitutional infirmities that plague the warrants to search the Subject Premises, but even more so, and notwithstanding the heightened concerns attendant to such searches.

### F. All evidence obtained as the fruit of the seizures of two cell phones taken from Tortora's daughter at the time of Tortora's arrest, should be suppressed as having been unlawfully seized

Mr. Tortora was arrested on or about August 2, 2018 at his Yonkers, N.Y. residence, pursuant to an arrest warrant dated July 26, 2018. At that time, Yonkers detectives and FBI agents seized, among other things, three cell phones – two Samsung models and a Kyocera – belonging to Mr. Tortora (*see* Tortora affidavit, Ex. L, ¶ 2). Thereafter, the government obtained a warrant to search the phones, and, on information and belief, the government intends to introduce at Mr. Tortora's trial evidence obtained as the fruit of the ensuing searches.

In his application to search the phones (Exhibit J) FBI Special Agent Christopher Munger asserts that, during his arrest on August 2, 2018, Mr. Tortora stated "he had his cell phone in his pants pocket … removed a cell phone from his… right pant pocket and turned that cell phone

over to one of the officers." Munger Aff. Ex. J, p.11 at ¶ 24(d). Thereafter, when Mr. Tortora's daughter retrieved certain of Mr. Tortora's medication she also, allegedly, provided "two additional cellular phones to the Officers" and "TORTORA confirmed that the two phones were his, but stated that the phones were older and he no longer recalled the passwords." The detectives and agents seized all three phones.

The seizure of the two phones from Mr. Tortora's daughter was unlawful as without warrant, and absent an exception to the warrant requirement. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate...." *Barrows v. Coleman*, 352 F. Supp. 2d 276, 281-82 (D. Conn. 2005) (*quoting Franks v. Delaware,* 438 U.S. 154, 165 (1978)). Thus "warrantless searches and seizures are per se unreasonable under the Fourth Amendment, absent a few specifically established and well delineated exceptions." *Gombert v. Lynch*, 541 F. Supp. 2d 492, 503 (D. Conn. 2008). Pursuant to a lawful arrest, police may seize items on the defendant's person, or within the defendant's immediate reach and control, *New York v. Belton*, 453 U.S. 454, 457(1981); *United States v. Chadwick*, 433 U.S. 1, 14 (1977); *Chimel v. California*, 395 U.S. 752, 763 (1969), and for this reason we do not contest the seizure of the phone that was on Mr. Tortora's person. However, the two phones seized from Mr. Tortora's daughter were neither obtained from Mr. Tortora's person, nor were they within his immediate reach and control. Accordingly, their seizure violated Mr. Tortora's Fourth Amendment rights. The subsequently-entered warrant to search these phones

was the illicit fruit of these seizures, which requires all evidence thereby obtained be suppressed. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("Under the Court's precedents, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so-called "'fruit of the poisonous tree.'") (citations omitted).

**G. The good faith exception to the exclusionary rule does not save the searches.**

To the extent the Court finds that the warrant affidavits do not establish probable cause, the fruits of the searches should be suppressed because the lack of probable cause, combined with the withholding of material information relevant to the informants' credibility and reliability, preclude application of the good faith exception. To the extent the Court finds that the initial warrants were unlawful general warrants, the fruits of the primary searches should be suppressed because the good faith exception cannot save a general warrant.

The so-called "good faith exception" to the exclusionary rule, embodied in the holding of *United States v. Leon,* 468 U.S. 897 (1984), provides that "evidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (internal quotation marks omitted). "Likewise government agents act in good faith when they perform 'searches conducted in objectively reasonable reliance on binding appellate precedent.'" *United States v. Ganias*, 824 F.3d 199, 236 (2d Cir. 2016) (*quoting Davis v. United States,* 564 U.S. 229, 232 (2011)). However, "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. Voustianiouk*, 685 F.3d 206, 215 (2d Cir. 2012) (*quoting United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)).

In *Leon*, the Court recognized that a search warrant, and the search conducted pursuant thereto, are patently invalid if the affidavit submitted in support of the issuance of the warrant states merely "bare bones" conclusions (*Leon, supra*, 468 U.S. at 923 n.24, 926), or is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable". *Id.* at 925. The inadequacy of such an affidavit is so well settled in Fourth Amendment jurisprudence that an officer would be grossly derelict not to know it. *See, e.g., Nathanson v. United States*, 290 U.S. 41 (1933); *Aguilar v. Texas*, 378 U.S. 108 (1964); *Riggan v. Virginia*, 384 U.S. 152 (1966) (per curiam); *Illinois v. Gates*, 462 U.S. 213, 239 (1983) (dictum) ("[a]n officer's statement that '[a]ffiants have received reliable information from a credible person and do believe' that heroin is stored in a home, is likewise inadequate"). Likewise, good faith reliance on a warrant will not be found where the magistrate or judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923. In these situations, the logic of *Leon* – to preserve the exclusionary rule in warrant cases when any adequately trained police officer would know that a search warrant is unconstitutional –implies that suppression is required.

Consistent with *Leon*, this court should suppress the evidence seized as a result of the primary searches, as well as the fruit of those searches, because the search warrant affidavit lacked indicia of probable cause and the search warrant was so deficient that it constituted a general warrant.

To the extent the initial warrants were not supported by probable cause, their execution was not in good faith. There was no factual support in the Geiss affidavit for the conclusion that evidence of a 20-year-old murder would be found in the subject premises. And the affidavit's

claim that evidence of the other indicted crimes would be found on the Subject Premises was dependent entirely on Detective Geiss's claim that, according to CS-1, "Tortora uses the Subject Premises to conduct various criminal activities, including loansharking, collecting gambling debts, laundering stolen and fraudulent checks and buying and selling stolen jewelry." Geiss Aff. ¶ 17. CS-1, however, is not identified, nor are his alleged representations corroborated, and the facts said to establish his reliability and credibility are so obviously deficient that no reasonable law enforcement agent could reasonably have relied on a warrant issued pursuant to such representations. In particular, Detective Geiss merely states, "The information provided by CS-1 has been proven reliable, in that it has been corroborated by other cooperating witnesses and confidential sources, recorded conversations, surveillance, and telephone records." Yet as Detective Geiss well knew, he provided the Magistrate no information from which the latter could independently determine whether Detective Geiss's representations, concerning CS-1's reliability, were founded.

Furthermore, it appears that Detective Geiss failed to acknowledge one or more prior convictions of CW-1 and it therefore is possible that he failed to acknowledge a criminal record of CS-1. If this is so, then ipso facto the good faith exception cannot apply, as the agents could not, in good faith, rely on warrants issued as a result of their own withholding of material facts, and the court should therefore conduct a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978). For all these reasons Detective Geiss and his fellow agents had no objective basis to rely upon the issuance of the warrant.

To the extent the initial warrant was a general warrant, the government cannot avail itself of the good faith exception as "it is obvious that a general warrant authorizing the seizure of evidence without mentioning a particular crime or criminal activity to which the evidence must

relate is void under the Fourth Amendment." *United States v. Cioffi*, 668 F. Supp. 2d 385, 397 (E.D.N.Y. 2009) (*quoting United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)); *see also United States v. Wecht*, 619 F. Supp. 2d 213, 235 (W.D. Pa. 2009) ("Courts in this circuit have consistently held that the good faith doctrine will not save a general warrant"). Here, although the warrant mentioned specific crimes, the categories of evidence that the warrant authorized the agents to seize went far beyond evidence of those crimes, but rather permitted the seizure of virtually everything of value on the premises. *See* discussion *ante.* pp 18-21. For this reason, the warrant was so blatantly improper that, even if the warrant were considered "merely" overbroad rather than "general," or even if the good faith exception could be applied to a general warrant, the evidence should be suppressed because the "overbreadth" or the "generality" of the warrant should have been apparent to any reasonably informed law enforcement officer.

Similarly, the ESD warrants cannot be saved by the good faith exception, both because they suffer from the same defects as the initial warrant and, as discussed above, ESD warrants raise unique privacy concerns that counsel greater scrutiny to assure fidelity to the underlying Fourth Amendment principles of probable cause and particularization. Here, the ESD warrants contained no guidance at all for how the ESD searches were to be conducted and were so broadly written as to authorize the review, and seizure, of virtually every file on the devices. Such all-encompassing and unguided authority was so patently excessive that no law enforcement officer could reasonably have believed the warrants to be lawful.

For these reasons the good faith exception to the exclusionary rule avails the Government nothing.

## II. The government should be required to provide additional discovery

### A. The government should be required to identify CS-1 and CW-1 and provide additional information relating to their credibility

The government should be required to identify CS-1 and CW-1 pursuant to *Roviaro v. United States*, 353 U.S. 53 (1957), and *United States v. Cannone*, 528 F.2d 296, 298-300, 301-02 (2d Cir. 1975). In doing so, the government should provide certain relevant information regarding each because the government relied upon them to secure the search warrant; and also because it appears that each is a likely and important government witnesses at trial. Specifically, we ask that the Court direct the government to review all relevant files with respect to CS-1 and CW-1 and provide the defense, at the least, the following information about each:

- Their true names and any aliases

- Their criminal history

- Any agreement they have with the government

- Their history of government compensation

- Whether either has ever been found to have withheld material information from the government or to have provided false information to the government

- Other information in the government's actual or constructive possession that would be discoverable under *Brady*, *Giglio* and their progeny.

To the extent the government believes that no information in CS-1 and CW-2 files are conceivably *Brady* material, or are discovery under *Roviaro* or otherwise, we ask that all such files be produced to the Court for in camera review. *See United States v. Nosov*, 153 F. Supp. 2d 477, 482 (S.D.N.Y. 2001), (*citing United States v. Kiszewski*, 877 F.2d 210, 215–16 (2d Cir. 1989)) (holding that, following a specific request by the defendant, *in camera* review by the

district court of a witness's personnel file was required to determine whether it contained *Brady* material).

In *Roviaro, supra*, the Supreme Court agreed that the identity of a key figure in the charged crime should have been disclosed, concluding

> that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id*. at 62; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 870-71 (1982) (dictum). Thus, although *Roviaro* recognizes that the informant privilege exists to protect the public interest in effective law enforcement, *see Roviaro*, 353 U.S. at 59, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," the privilege must give way. *Id.* at 60–61.

"The defendant bears the burden of showing the need for disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997); *accord United States v. Goode*, 2018 WL 919928, at *18 (S.D.N.Y. Feb. 15, 2018) (Roman). Therefore, the defense is not entitled to the informant's identity merely for the asking, *McCray v. Illinois*, 386 U.S. 300 (1967), particularly where there is sufficient information elsewhere, such as in the record of a preliminary hearing, "to show that the informant was reliable and his information credible." *Franks v. Delaware*, 438 U.S. 154, 170 (1978). However, a "***defendant is generally able to establish a right to disclosure where the informant is a key witness or participant in the crime***

*charged, someone whose testimony would be significant in determining guilt or innocence*." *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (emphasis added); *accord United States v. Gomez*, 2018 WL 501607, at *3 (S.D.N.Y. Jan. 19, 2018) (Furman).

Additionally, even where the identity of an informant need not be revealed, the government should be required to disclose non-identifying information material to the sufficiency of a search warrant or to guilt or innocence. Such information might include, e.g., an informant's plea agreement, his prior criminal history, and his compensation.

Here, the identities of CW-1 and CS-1 are key to Mr. Tortora's ability to challenge the search warrant, as well as to prepare for trial. Detective Geiss's affidavit in support of the warrant is dependent, nearly entirely, on information obtained from CW-1 and CS-1. Therefore, disclosure of their identity would be helpful, if not necessary, in determining whether Detective Geiss's affidavit was truthful and thorough or whether, for example, it omitted material information relevant to the assessment of their credibility. As noted previously*, see ante* p. 15-16, it appears, based on our good faith belief that CW-1 has an undisclosed prior conviction, that material information regarding CW-1's credibility was withheld from the issuing magistrate. Furthermore, the paucity of information provided the magistrate regarding CW-1 and CS-1's history as informants militates in favor of providing additional discovery to gauge the truthfulness of Detective Geiss's claim that they are reliable and credible.

Both informants, moreover, likely will be trial witnesses. CW-1 allegedly has admissible information regarding the murder of Richard Ortiz, as well as information allegedly connecting Mr. Tortora to the charged racketeering enterprise. CS-1 is alleged in the Geiss affidavit to possess first-hand information regarding all the charged racketeering acts, other than the Ortiz

murder. Accordingly, the requested discovery should be ordered, or, in the alternative, the Court should review all files pertaining to CS-1 and CW-1 in camera to determine what information should be disclosed.

      **B.**  **The government should be required to disclose the identity of the numerous persons interviewed by the police, as reflected in police reports provided to the defense, with respect to the Ortiz murder investigation as well as other requested discovery.**

By letter dated June 21, 2019 (Exhibit M), the defense asked the government to provide discovery, *inter alia*, of unredacted copies of previously-disclosed police reports pertaining to the investigation of the murder of Richard Ortiz, which is the subject of Counts Two and Three of Superseding Indictment, as the redacted copies provided to the defense deletes the names of the approximately 50 witnesses referenced in the reports as well as other information.

Thereafter, in a June 29, 2019 email (Exhibit N) Mr. Tortora's counsel asked the government to produce:

- The last name, address, and contact information for witness number 37 in the YPD reports. I believe this individual ███████ has exculpatory information about the murder of Richard Ortiz

- The tapes of the FBI calls made by ███████ back in 2009

- All interviews conducted by YPD [Yonkers Police Department] and the FBI that can be considered either Brady/Giglio material of ██████████ ████████████████████ (CW-2), and all tapes and interview notes which were used to prepare the YPD reports previously forwarded in Discovery; including but not limited to all 56 witnesses

By letter dated September 5, 2019, the government declined to provide any of the requested information, citing that it "has turned over materials in its possession responsive to Rule 16 and *Brady*" and that it is "aware of its obligations pursuant to *Giglio* and 18 U.S.C. § 3500 and intends to turn over materials relating to testifying witnesses at the appointed time in advance of

trial." The requested information should be ordered and turned over now. In many instances the reports contain *Brady* information. By way of example,



Witness 30's statement unquestionably is *Brady* material because it provides evidence that ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ e. Further, it suggests that the Detectives and, by extension, the Government, which has worked with the Yonkers Police Department during much of this investigation, are in possession of information supporting this alternate theory. Thus, the government should be ordered to provide Witness 30's identity and contact information. The order should also require the government provide, and specifically identify, any additional evidence in the government's actual or constructive possession supporting an alternate theory of why, and by whom, Mr. Ortiz was murdered.

Another example:



████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.

Another example:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

Another example:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

These reports, as well as several others, demonstrate the Government has not fully complied with its discovery obligations. To the extent the Government believes it need not provide the requested non-redacted copies of the police reports, we ask that the Court order the Government to provide the non-redacted police reports to the Court for its camera review.

### C. __The government should be required to respond to questions asked in our letter dated June 5, 2019__

By letter dated June 5, 2019, Mr. Tortora's counsel wrote to the government requesting the following information:

> •      Pursuant to 18 U.S.C. § 3504(a)(1), please affirm or deny the use of the following surveillance techniques, the fruits of which we contend would be inadmissible as having been obtained in violation of Mr. Tortora's constitutional and statutory rights. In considering this request, please confirm their occurrence or non-occurrence with both state and federal law enforcement employees who have investigated this case or have otherwise had access to information regarding this case, as they may have used these or other investigative techniques but have not as yet informed you of such:
> > •      Pole cameras
> > •      Sting Ray/cell site simulators
> > •      Tracking devices
> > •      Title III electronic surveillance
> > •      Other surveillance/recording devices
>
> •      Pursuant to Brady, Bagley, Giglio and their progeny, please provide us any information in your possession or in the possession of any state or federal law enforcement employee who has worked on this investigation or who otherwise has information regarding this investigation that undermines the credibility of the persons identified as CS-1 and CW-1 in the affidavit in support of the search warrant to search 1 Saw Mill River Road, Yonkers, N.Y.
>
> Please conduct a similar search for discoverable evidence relating to any other person or persons having information regarding this case regardless whether they will be a trial witness, including both lay and law enforcement individuals.

We additionally asked the government:

In complying with these requests please personally review, among other things, any files maintained by state and federal law enforcement with regard to these individuals rather than limiting your search to files in the actual possession of the United States Attorney's office. See DOJ Criminal Resource Manual CRM 165 (Guidance for Prosecutors Regarding Criminal Discovery, directing review of the investigative agencies' files, including Confidential Informant (CI), Confidential Witness (CW), Confidential Human Source (CHS) and Confidential Source (CS) files, substantive case-related communications, and other evidence). If for any reason you believe that one or more disclosures called for by this request should not be required, … we ask that you create and provide us with a privilege log so we may bring an appropriate motion.

The government has not provided the defense with any of the requested information. Therefore, we ask that the Court order the government to do so, as each of Mr. Tortora's requests are supported by law. The first series of requests is explicitly authorized by 18 U.S.C. § 3504(a)(1), which provides:

> upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

Without the requested disclosures, Mr. Tortora would not be in a position to make an appropriate motion to suppress the fruits of the listed investigative tools had they been utilized, were Mr. Tortora's lawyers to conclude their use may have been unlawful.

Mr. Tortora's request for *Brady/Giglio* information is further explained in Point II(A), *ante*, in which we discuss his right to discovery bearing upon whether the Geiss affidavit in support of the initial searches omitted material information bearing upon CS-1 and CW-1's credibility.

Accordingly, the Court should order the government to provide the requested information.

**III. The Court should Enter a Scheduling Order Consistent with the Volume of Discovery, the Seriousness of the Charges, the Number of Potential Witnesses and Exhibits, and the Anticipated Length of the Trial, to Permit Adequate Trial Preparation and to Assure the Efficient Conduct of the Trial**

The discovery in this case has been immense. So much so that no reasonable possibility exists to carefully read every page of discovery, yet counsel obviously are obliged to provide Mr. Tortora the effective assistance of counsel. As a practical matter, to do so counsel must have access to vital information within a reasonable time before trial, including: A book of exhibits the government intends to offer at trial; a witness list; the government's 404(b) letter; 3500 material; and the principal jury instructions. To this end, the defense has engaged the government to reach agreement regarding appropriate dates to produce vital information, but we have not been able to do so. We therefore ask the Court to set appropriate dates, that reflect the extraordinary volume of discovery, the seriousness of the charges, number of anticipated witnesses and exhibits, the anticipated complexity and length of trial, and the need for defense counsel to provide Mr. Tortora effective assistance of counsel.

In considering an appropriate schedule, we attach for the Court's consideration (as Exhibit R) a scheduling order recently entered in an unrelated two-defendant tax prosecution in the District of New Jersey, *U.S. v. Grant*, 18-cr-179 (WJM), which also included voluminous discovery. This order was negotiated between the parties, with the district court's assistance, and provides reasonable time periods for the production of the relevant trial-related materials. In respectfully suggesting that Court adopt analogous disclosure dates, we note there is no reason to believe that the requested disclosures would in any way endanger government witnesses. Moreover, the order entered in *U.S. v. Grant* provides the government flexibility to amend its disclosures when, for example, in good faith it wishes to add additional exhibits, witnesses, etc.

41

We therefore propose the following dates for the government's disclosures, and of course are also amenable to dates relating to the defense disclosures, as well as agreements regarding the authenticity of proposed exhibits, as reflected in Exhibit R:

1. Preliminary, non-binding list of government trial witnesses 90 days before the trial date;

2. Preliminary, non-binding list of government trial exhibits and copies of the marked exhibits 90 days before the trial date;

3. Government disclosure of any expert notice 90 days before trial;

4. Government 404(b) letter 90 days before trial;

5. Government's requests to charge 90 days before trial;

6. Government disclose of 18 U.S.C. 3500 material § 75 days before trial;

7. A final government list of trial witnesses 30 days before trial; and

8. A final government list of trial exhibits and copies of any marked exhibits not previously provided 30 days before the trial date;

## Conclusion

For all the foregoing reasons the motions should be granted or a hearing conducted.

Dated: New York, New York
        September 9, 2019                                    /s/
                                                    _____
                                                    Barry Levin, Esq.
                                                    100 Fairway Road
                                                    Lido Beach, NY 11561
                                                    Tel. 516-222-4500


                                                         /s/
                                                    _____
                                                    Richard Levitt, Esq.
                                                    Levitt & Kaizer
                                                    40 Fulton Street, 23rd Floor
                                                    New York, N.Y. 10038
                                                    Tel. 212 480-4000
                                                    *Counsel for John Tortora*