UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 18 CR 537 (SHS)

JOHN TORTORA,

Defendant.

------------------------------x

New York, N.Y.
January 24, 2022
2:00 p.m.

Before:

HON. SIDNEY H. STEIN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: JUSTIN RODRIGUEZ
Assistant United States Attorney

LEVITT & KAIZER
Attorneys for Defendant
BY: RICHARD W. LEVITT
BARRY LEVIN

(Case called)

THE DEPUTY CLERK: Counsel, please state your names for the record.

MR. RODRIGUEZ: Good afternoon, your Honor.

Justin Rodriguez for the United States.

THE COURT: Good afternoon.

MR. LEVIN: Barry Levin for Mr. Tortora, with my co-counsel, Richard Levitt.

Good afternoon, your Honor

MR. LEVITT: Good afternoon, Judge. And Mr. Tortora is to my left.

THE COURT: Good afternoon. Please be seated in the courtroom.

We're here for the sentencing of Mr. Tortora. We have a new set of protocols, so I'm going to ask everyone to keep their masks on while they speak. Please speak loudly and clearly so that the reporter can hear.

Let me tell you what I have. There is a fair amount of information. I have a government submission document 119, which is a December 18, 2020 letter of the government. There is a set of documents from when we had the sentencing on originally back in 2020 as well as now. I'm going to read it all to you.

We have the revised pretrial presentence investigation report, which is document 140. It was prepared on April 24,

2020, and revised on December 29, 2021. I have Mr. Tortora's sentencing submission of December 3, 2020, along with its various exhibits. I have document 116, which is a letter of the government dated December 8, 2020. That's when the issue was whether or not there was going to be a Fatico hearing, which has since been resolved. I have ECF number 138, which is the government letter of December 17, 2021, in which the government states that it no longer intends to prove, in connection with sentencing, the racketeering acts in paragraph eight, and the conduct with respect to the murder of Richard Ortiz, paragraph nine. I have document 120, which is the submission of Mr. Kaizer, in which he advises the court that Mr. Tortora continues to challenge racketeering acts, paragraph eight.

MR. LEVIN: Excuse me, your Honor. Can you repeat that, please?

THE COURT: That is back from December 21, 2020, so it was when the Fatico hearing was still at issue.

MR. LEVIN: Thank you, your Honor.

THE COURT: I have the document 141, of Levitt & Kaizer, dated January 7, 2022. So we're now, as it were, the post-Fatico issue. And the government letter, document 142, January 14, 2022.

I also have the letters that have been sent to my chambers in the past few days. The parties may not have seen

these. I have a letter that was sent to my deputy and the e-mail, which it came in on Wednesday, January 19, and it's a letter to me from Mr. Tortora's half sister, who she says just met her brother before he was arrested. I have a letter also sent directly to chambers by U.S. mail and by e-mail from Desiree Cardinali. These letters, both of these letters are in support of Mr. Tortora.

If the parties have not seen these letters, let me hand them down.

Has the defense seen these letters?

MR. LEVITT: No, your Honor, we have not.

MR. LEVIN: No, your Honor.

THE COURT: Has the government seen these letters?

MR. RODRIGUEZ: No, your Honor.

THE COURT: All right. Here they are. Take your time.

(Pause)

MR. LEVIN: Do we have an extra set?

THE COURT: No, it's not an extra set, but you'll switch after reading them.

MR. RODRIGUEZ: Your Honor, may I consult with a member of law enforcement in the gallery?

THE COURT: Yes, of course.

(Pause)

Are the parties ready?

MR. LEVITT: Just one moment. Mr. Tortora is reading the last letter, your Honor.

THE COURT: OK.

(Pause)

MR. LEVITT: Thank you, Judge.

THE COURT: Defense, is there any additional written information I should have?

MR. LEVIN: Your Honor, the only two other items which the court may or may not want is a picture of Mr. Tortora's home and how he earns his living since he's been sick, which is Social Security disability, a 2021 1099. I can provide them to the court.

THE COURT: Get me whatever you want.

MR. LEVIN: Thank you, judge.

THE COURT: All right. The defense has handed up to me the subpoena to the Westchester check-cashing company on One Saw Mill River Road, along with a rider to that subpoena, as well as the form SSA 1099, that is the Social Security benefit income statement from 2021, which shows $26,958 in Social Security benefits in 2021, and a picture of what the defense has stated is Mr. Tortora's home in Yonkers.

Government, is there any additional written information I should have?

MR. RODRIGUEZ: No, your Honor.

THE COURT: Mr. Levin, have you and Mr. Tortora had a

full opportunity to read and discuss all of this information and have you read and discussed it?

MR. LEVIN: Yes, your Honor, we have.

THE COURT: Do either you or your client have any objections to the findings of fact in the revised presentence report?

MR. LEVIN: I have one, your Honor.

THE COURT: Sir.

MR. LEVIN: In the revised presentence report most recently submitted to the court, notwithstanding the government's letter in December withdrawing all allegations and intent to prove Mr. Tortora's involvement not only in the murder, but in the racketeering and the predicates that were in the original indictment, probation did not see that letter and they referred in --

THE COURT: Sir, what's your objection to paragraph eight?

MR. LEVIN: My objection is they say he was involved in drug dealing as parting of their recommendation.

THE COURT: Where is that?

In the revised report, there is no finding of fact in regards to drug dealing. So where is it with respect to that, that should not be there?

MR. LEVIN: Page 22 of the sentencing recommendation, under the paragraph annunciated justification. Last sentence.

THE COURT: The phrase assisting in the sale of narcotics?

MR. LEVIN: Yes, your Honor.

THE COURT: All right. Government, I take it the request of the defense is to strike the phrase assisting in the sale of narcotics?

MR. RODRIGUEZ: No objection, your Honor.

THE COURT: All right. I'm going to do that.

Anything else?

MR. LEVIN: The whole sentence, your Honor, they didn't delete any of the allegations that the government withdrew.

THE COURT: Well, that's something different, sir.

Are you objecting to paragraph eight I and II, that is that Tortora was involved in running illegal gambling machines from 1997 through 2018, as well as the interstate transmission of wagering information from 1997 through 2018?

MR. LEVIN: Your Honor.

THE COURT: He has pled guilty, here, sir.

MR. LEVIN: He pled guilty to the use of a telephone in regard to gambling. So to the extent --

THE COURT: That is different than the interstate transmission of wagering information. The telephone is a kind of a local thing from one street in Yonkers to the other.

MR. LEVIN: I think the distinction, Judge, is not

that as much as running illegal gambling machines from 1997 through 2018 --

THE COURT: That is in there. Are you objecting to it?

MR. LEVIN: Yes.

THE COURT: What's the position of the government?

MR. RODRIGUEZ: Your Honor.

THE COURT: Wait. Let's be clear about this because this is relevant, sir.

Is the objection of the defense to the inclusion of the statement in that role, Tortora was involved in running the illegal gambling -- in running illegal gambling machines from 1997 through 2018, is that what you're objecting to?

MR. LEVIN: That is the exact objection, Judge.

THE COURT: OK. And I take it also, on page 22, the phrase assisting in the sale of narcotics, the court agrees that last phrase should go out.

MR. LEVIN: Your Honor, in carrying over to page 23, the remainder of that paragraph, I think what was incorporated here by this probation officer was the same language that was in the original justification.

THE COURT: I see what you're talking about.

Let's put aside the sentencing recommendation for a moment. Let's deal now with paragraph eight.

The objection as I understand it is a finding of fact

in paragraph eight, government, is solely the inclusion of the phrase "running illegal gambling machines from 1997 through 2018." What's the position of the government?

MR. RODRIGUEZ: The government does not object to striking that phrase.

THE COURT: All right. The court then will adopt the findings of fact in the revised presentence report with the exclusion of the phrase "running illegal gambling machines from 1997 through 2018." Therefore, paragraph eight will now read: John Tortora has been an associate or a member of La Cosa Nostra (LCN) since at least the 1999s until his arrest in this case in the summer of 2018. In that role, Tortora was involved in the interstate transmission of wagering information from 1997 through 2018.

All right. I'm making that change and that's how paragraph eight now reads. Now, Mr. Levin, technically the sentencing recommendation is not part of the findings of fact, but I can understand why you have the objection. It seems to me that on the sentencing recommendation, under justification, I should strike the phrase "assisting in the sale of narcotics."

MR. LEVIN: Your Honor, respectfully, that paragraph carries over to the top of page 23, and it continues to rely on the initial allegation.

THE COURT: I understand. I'm trying to see what it

is that specifically you're asking be taken out. Obviously you're asking that the phrase additionally, the defendant obstructed justice. Now, so that stays. So what is it that you want out of that justification paragraph in addition to assisting in the sale of narcotics?

MR. LEVIN: Your Honor, what the court has already agreed to, finishing that sentence on page 23, it also says he was involved in the extortion of money from businesses and individuals in making extortionate loans.

THE COURT: All right. You're asking that the phrase extorting money from businesses and individuals making extortionate loans, you want that out?

MR. LEVIN: Yes, your Honor.

THE COURT: Government?

MR. RODRIGUEZ: No objection.

THE COURT: All right. That phrase goes out.

So it now will read: From 1997 to 2018, the defendant participated in running illegal gambling machines and operating illegal gambling businesses.

Done.

MR. LEVIN: The last sentence that talks about the investigation of the murder where it says the defendant obstructed justice in the investigation of the murder of Richard Ortiz by destroying or causing destruction of a surveillance video. Your Honor --

THE COURT: He's pled to destroying or causing the destruction of the surveillance video --

MR. LEVIN: No question.

THE COURT: -- which the subpoena apparently was in connection with an investigation of the murder of Richard Ortiz.

MR. LEVIN: Your Honor.

THE COURT: That's why the subpoena was issued.

MR. LEVIN: Understood, but two points.

Number one, the reason --

THE COURT: Speak into the mic.

MR. LEVIN: I'm sorry.

THE COURT: Or you can go to the lectern if you would prefer. Whatever is easiest for you.

MR. LEVIN: Can you hear me now, your Honor?

THE COURT: I can.

MR. LEVIN: Thank you.

Two points in regard to that. Number one, the subpoena itself, why I handed up to the court today, when the court reviews the subpoena, there is no mention in that subpoena that there is an investigation of murder.

THE COURT: I understand, but the government states that it was an investigation of the murder of Richard Ortiz. That's what paragraph eight says, if I remember correctly.

Let me take a look.

MR. LEVIN: Originally.

THE COURT: You don't have to be conceding that it was an investigation in connection with the murder of -- paragraph eight doesn't even have it in it.

But that's the position of the government, that it was their investigation of the murder of Richard Ortiz. You don't have to sign off on that. That's the government position.

MR. LEVIN: Understood. I'll address it in my comments and we'll move forward.

THE COURT: All right.

MR. RODRIGUEZ: Your Honor, may I be heard on that point, please?

THE COURT: Yes.

MR. RODRIGUEZ: The defense has actually stipulated to that in the plea agreement, and by taking that position today, they would be in breach of the plea agreement. I'm looking at page two, paragraph seven, which says --

THE COURT: I'm sorry. Page?

MR. RODRIGUEZ: This is in the plea agreement.

MR. LEVIN: Do you have the plea agreement handy?

THE COURT: Just a moment, sir.

MR. LEVITT: Your Honor, can I truncate this conversation by just acknowledging that we are not questioning, and if there was any suggestion that we are questioning, we withdraw it. We are not questioning that the investigation,

the grand jury investigation, was an investigation, among other things, into the murder of Mr. Ortiz. So to the extent that that was suggested in any way, that's not our argument. Any such suggestion is withdrawn.

THE COURT: All right.

MR. RODRIGUEZ: Thank you, your Honor.

THE COURT: I take it the government is not arguing that there a breach?

MR. RODRIGUEZ: Based on the most recent comments of counsel, your Honor, we are not.

THE COURT: All right. Fine. I have amended the findings of fact as I have described. I hope it's clear and straightforward. The sentencing recommendation is going to be kept the same except for the phrases that I deleted. All right. Otherwise, the findings of fact are adopted.

I should ask, does the government have any objection to the findings of fact?

MR. RODRIGUEZ: No, your Honor.

THE COURT: OK. Let's have one counsel talk to me, not two. One counsel talk to me on the defense side.

MR. LEVIN: If I may, your Honor?

THE COURT: Yes.

MR. LEVIN: As the court is aware, Johnny Tortora was arrested on August 2 of 2018. He was charged with a death penalty murder, murder in aid of racketeering, RICO conspiracy,

and RICO predicates of murder, extortion, drug dealing, robbery and gambling.

At the time that the government arrested Mr. Tortora, it executed two search warrants. One for the Yonkers business that he was a manager of, and two, when arresting him, they confiscated three cell phones. They then got a warrant for the cell phones. We know that Mr. Tortora -- I would like to refer to him as Johnny, if the court doesn't have any objection.

THE COURT: No, not at all. He is called Johnny here, he is called Johnny T, one of the letters says he is called Johnny Smiles, however you want to identify him.

MR. LEVIN: I identified him as Johnny for three and a half years, your Honor.

THE COURT: Fine.

MR. LEVIN: Johnny was held without bail for 21 months because of the severity of the charges, the murder, drug dealing, extortion.

THE COURT: And that's been dropped, you're right.

MR. LEVIN: But the point I'm making --

THE COURT: He's going to be credited with that time in jail. That doesn't make up for the fact that he was in jail, that is correct. But certainly the bail issue would have arisen regardless of what the charges were, that is whether or not he was charged with the murder or not. There still would have been a bail issue. That is not how it was presented to

the court, which I think is the point you're making.

MR. LEVIN: Exactly, your Honor.

THE COURT: I understand.

MR. LEVIN: Also, at that time, on August 2, the government seized hundreds of thousands of documents from the businesses. They seized computers, ledgers, cash, jewelry, the phones which I just alluded to, text messages and e-mails.

What do we learn three and a half years later? That not one piece of incriminatory evidence --

THE COURT: Let me ask this, sir, because I would much rather deal with the charges to which he has pled guilty than deal with charges that are not before me now. There is no question that the government's case here at sentencing and the plea itself was much narrower than the original charging instrument. There was involvement in the murder of Mr. Ortiz was alleged, there was the plea agreement, there was a great deal of negotiation over a long period of time in regard to that plea agreement, and it ultimately was arrived at, and it was a plea to two separate crimes which did not involve murder.

The government wanted to have a Fatico hearing, which for those in the courtroom who are not attorneys, a Fatico on whether or not Mr. Tortora was involved in the murder of Richard Ortiz. And there were preparations for that and there was discovery in regard to that and there were negotiations in regard to that. That went on along for an extended period of

time during which for about two years of that, Mr. Tortora was not incarcerated, but he was home under some restrictions, as I recall.

The government ultimately decided not to pursue the Fatico hearing, that is decided not to prove, not to try to prove by a preponderance that Mr. Tortora was involved in the murder of Richard Ortiz, and that was all dropped out. You're quite correct, the government case is much narrower than it was originally. You don't have to convince me of that, sir.

Help me with what we have here now.

MR. LEVIN: That's fine, your Honor.

THE COURT: Sentencing to two substantial criminal crimes -- I'm sorry, two substantial federal crimes.

Go ahead.

MR. LEVIN: I will address that throughout my statement. What I am trying to impress upon the court is, and as the court knows, his incarceration as a result of being denied bail, not only does he get credit, but in this particular case, when the --

THE COURT: Try to stay by the mic. I'm sorry. We're all under restrictions and you have the mask on, I appreciate that. But I need the court and the court reporter, hopefully everybody in the courtroom, to be able to hear you.

Go ahead.

MR. LEVIN: Understood, your Honor.

I would like to address the history of this proceeding as it affects your Honor's decision with regard to the proper sentence of Mr. Tortora, so there are some things I'm saying not for the purpose of rehashing old litigation, but as it pertains to the sentencing practice.

THE COURT: Well, what is that?

He was in the MDC at an extraordinarily difficult time.

MR. LEVIN: Correct.

THE COURT: He was there when they all the well-publicized problems with heat and food and toilets. I understand that. That was a very, very difficult situation, and I think they are still trying to work it out.

MR. LEVIN: As well as --

THE COURT: In fact, I mean, we'll get to this ultimately, but when I do sentence Mr. Tortora, it seems to me that he should be able to self-report so that he can go not to the MDC with some of those problems still continuing, but directly to the institution where the BOP would send him, which, one assumes, does not have those problems of the MDC and that he would have more time for being outside, more time for classes, and more opportunities for education and self-improvement.

Go ahead. But that's down the road.

MR. LEVIN: Thank you.

In regards to the plea issue, not only did the government drop all the charges we just discussed, but after having the opportunity to look through hundreds of thousands of documents, they returned everything to him. They returned the cash that was in the safe, which --

THE COURT: What is the purpose of this?

MR. LEVIN: That the government had no evidence, Judge. The point I'm trying to make is the government did not have any evidence of incriminatory behavior.

I apologize. It's just my habit. I've been doing this for 35 years. I'll keep moving.

THE COURT: I understand that the government has dropped its charges in regard to a whole litany of charges. I want to talk about -- I want to learn about what the parties think the appropriate sentence is of the two charges to which he has pled guilty.

MR. LEVIN: I'll get right into it, Judge.

As to the obstruction, Mr. Tortora, no question, did not turn over a videotape that the government that showed an individual on supervised release was visiting him, and that individual was completely unrelated and had nothing to do with this grand jury investigation whatsoever.

Secondly, the guidelines, as your Honor states --

THE COURT: I mean, the question arises, why then would he -- it's not a matter of his not turning it over, sir.

It's a matter of his submitting a false affidavit and saying that the tapes, the requested information did not exist, when, in fact, it had been destroyed.

Why in the world -- what would the reason for that be? Why would he be doing it?

He pled to it.

MR. LEVIN: He was protecting a friend who he thought would get in trouble at the time he was on supervised release. At the time, he was on supervised release. There was no other motive. There was nothing else involved. It was a poor decision that was done because he believed his friend might get in trouble.

THE COURT: Is this paragraph nine states, the government learned that two days prior, that is two days prior to October 18, 2017, two captains with the Genovese crime family, including Tortora's own capo, Daniel Pagano, had visited Tortora at that location.

Is that who you're talking about; is that the friend who he didn't want to get into trouble?

MR. LEVIN: That is correct.

THE COURT: OK.

MR. LEVIN: We also dispute the fact that Mr. Pagano is a captain of Mr. Tortora, because the government doesn't even know if Mr. Tortora is a member of organized crime. They say so themselves in their submission, in their letter of

January 14. They say he's either an associate or member.

THE COURT: Please, I'm sorry. This is what I suggest you do, sir. Move that lectern over to the right.

MR. LEVIN: I'm going to control myself, Judge.

THE COURT: I understand, we all have habits. I'm not holding it against you. I'm making sure I understand everything you're saying.

MR. LEVIN: OK.

THE COURT: I suggest if you move that lectern over to the right of it, and then you can just wander within on the left margin.

MR. LEVIN: I promise I'll behave.

THE COURT: OK.

MR. LEVIN: As I was stating, the government doesn't even know who or what Mr. Tortora is. They don't know if he's a member of organized crime, because they so state that in their January 14 submission in the first paragraph. They say he's an associate or a member. They don't unequivocally state he is a member.

With that said, it is a reach for them to say that this individual that was visiting him was for an illicit purpose. The purpose in which he was visiting him is the gentleman was on supervised release, and he opened a painting company. Johnny is a pretty well-known guy in Yonkers. His business has been there for over 35 years. He was hoping

Johnny would help him get clients. Johnny, being a friend since childhood, made a very rash, inappropriate decision that his friend would be violated. In reality, nothing ever happened.

THE COURT: So you mean he handed in to the government through his lawyer a letter that said it was from a Microsoft Solutions and it had been updating the surveillance system at Westchester Check-cashing, and the system that was reset numerous times daily in review of the systems shows no recording for October 16, 2017. So he did that, he got this letter, it was put on the letterhead. The letterhead was given to him in blank so he had that information put in, and then ultimately provided to the government. When it turns out that, in fact, the information on that date had been purposefully deleted.

That was all to protect a friend who was on supervised release?

MR. LEVIN: Correct.

THE COURT: And simply a misjudgment.

MR. LEVIN: Well, it's more than a misjudgment. It's a felony, and I acknowledge that, and he pled to it. Obstruction, obstruction is a serious felony.

And the other thing the court should be aware of is that Mr. Tortora did not draft that letter. That letter was signed and prepared by the person that worked in the technology

company and was prepared by someone in his company.

THE COURT: I see.

MR. LEVIN: If I may continue?

THE COURT: Yes, only if you're talking into the mic.

MR. LEVIN: Yes, your Honor.

THE COURT: I tell you what. Do this. Move the mic. It's a directional thing. Move it to the right. That may help.

Go ahead.

MR. LEVIN: Let me address the issue of obstruction. The United States Sentencing Commission in 2020 issued a report. In 96 percent of cases federally nationwide, for obstruction, the sentences range from 18 to 30 months, 96th percentile.

I think the point I'm trying to make is the guidelines, although agreed to because of the factual predicate in this case, are illegal fiction. What do I mean by illegal fiction? If the backbone of criminal liability, as we learned starting in law school and throughout our practices, is culpability based on intent. I submit John Tortora had no intent, he had no knowledge, he had no idea about the murder of Richard Ortiz.

THE COURT: That's not what we're dealing with. Did he have the intent to obstruct an official proceeding?

MR. LEVIN: Of course. He pled guilty to it.

THE COURT: So he had the intent for the crime that you're talking about, am I correct?

MR. LEVIN: You're correct in the sense that he obstructed justice by not complying immediately with the subpoena. I'm not arguing with the court.

THE COURT: What was the average sentence on that count?

MR. LEVIN: 18 to 30 months under United States Sentencing Commission 2020 report.

THE COURT: That is the average you said?

MR. LEVIN: Yes, that was in the 96th percentile range.

THE COURT: All right. Well, that's relevant.

Then we have Count Two, interstate transmission of wagering information.

MR. LEVIN: Your Honor, as probation set forth, so far below the other guideline, that it is disregarded for purposes of calculation under the guidelines.

THE COURT: That is the grouping analysis. I'm concerned about the facts, interstate transportation of wagering information over a 21-year period.

MR. LEVIN: Your Honor, the gambling charge standing on its own carries a maximum sentence of two years.

THE COURT: Yes.

MR. LEVIN: And from my own experience in this

business for 36 years, I've never seen a client go to jail, and I can address that.

THE COURT: You mean who has pled to that single count?

MR. LEVIN: Yes, your Honor.

THE COURT: Is that what you mean?

MR. LEVIN: Yes.

THE COURT: That's not this. Go ahead.

MR. LEVIN: Let me tell the court a little bit about who Mr. Tortora is.

THE COURT: He's a complex person. There is no question about it. Just like most people, he's a complex person. He's kind to a lot of people. He's obviously very devoted to his daughter, extremely devoted, as she is to him. I think he participates in handing out turkeys. I don't mean to belittle that. He's a charitable person. He's made sure that down-and-out people in his neighborhood have some spending cash. He's told somebody that he would pay them to water his plants. Very generous personal attributes.

He also has a not inextensive, if that's a word, he has a considerable criminal history from the time he was 26 years old.

MR. LEVIN: I would respectfully disagree with the court. Mr. Tortora has a 39-year-old felony conviction for possession of stolen property and forgery also related to the

pawn broker business 39 years ago. His only other conviction was for a misdemeanor possession of stolen property in 2001. That is the extent of Mr. Tortora's criminal history.

THE COURT: Well, we don't need to debate that. What I have in front of me is that he was charged and, again, it was a long time ago, it was in '83, you're right, an offense of stolen VCRs, radios, and jewelry.

And then later on the same year, I'm sorry, attempted forgery and possession of credit cards, then receipt of stolen jewelry. So this would be his fourth conviction.

Go ahead. And there is a lot of good in his background. There is no question about it.

MR. LEVIN: I appreciate the court realizing that and taking into consideration when the court decides what the sentence will be.

I also want the court to know that he is a 65-year-old man that has reduced cognitive function from a stroke in 2014. He has numerous comorbidities. Vascular disease in advanced stages, severe hypertension.

THE COURT: One of the reasons I want to get him out of it. I don't want to have him go back to the MDC.

MR. LEVIN: He's diabetic. I'm hoping he doesn't go in at all. I'll address that as I finish my comments, because all of this is a death sentence for him if he were to go back. It's not just the MDC, your Honor. Mr. Levitt will address it

when he speaks, but the BOP nationwide has double the infection rate of the population. It is one of the reasons the BOP has been releasing people for the past two years who have not served their 85 percent of the sentence.

I am personally familiar with the case in which he was involved with the judge in this building, Judge Abrams, in U.S. v. Galanis, where my client was sentenced to three years. And after a year in Jesup, Georgia, he was released to home detention to finish his sentence.

THE COURT: Was that a compassionate release motion, is that what that was?

MR. LEVIN: Actually, he didn't even file a compassionate release motion. The BOP did it on its own.

THE COURT: They've been doing it.

MR. LEVIN: Same concept. Yes, your Honor.

I also want to bring to the court's attention, because I know the court is aware, that one of the purposes at sentencing under the sentencing factors is to avoid disparity, sentencing treatment.

At the same time I was representing Mr. Tortora I was involved in the case of U.S. v. Londonio, Southern District, Judge Cathy Seibel. What I would like to point out to the court is the average sentence in that case for defendants that were not charged with murder or drug dealing or drug conspiracy was 21 months. The docket number on that case, I have it if

the court needs, I have the names and people that were sentenced. In several cases, people charged with extortion, conspiracy to commit extortion, loansharking, all serious felonies, as serious as the obstruction, received time served. Now, those particular individuals that I'm referring to -- and I have the list over there if the court needs the names -- they had much more severe criminal history than Johnny Tortora.

So who do we have before today, Judge? You have a loving father and a caretaker of his family. He has helped numerous people throughout his life, through charitable endeavors, giving people jobs, lending people money and never getting it back.

Your Honor has at least 27 letters that were submitted in support of Mr. Tortora. Mr. Levitt and Kaizer and myself received probably closer to 50. We tried to pare it down for the submission. You have people here supporting him in court today. These are not just family members. These are members of the community. He has 20 some odd people here. I submit to your Honor, but for COVID, we probably would have had 100 to 200 people here.

I would also like to address the issue of the government asked for a fine in their letter of January 14.

THE COURT: They did. They wanted a substantial fine.

MR. LEVIN: Number one, as the court is aware, this was not a crime for profit. Mr. Tortora, since he's been

arrested, has not worked in his prior position in management at the check-cashing and pawn broker business. He lives on a Social Security stipend, which is now down to about 2700 a month. When the case started, it was higher. Your Honor has the 1099.

The house that the government referred to in their January 14 letter is the size of a small two-bedroom apartment. He bought that house when he first got married in 1989. He lives very modestly, Judge.

THE COURT: I take it he owns it?

MR. LEVIN: I don't know if he owns it or if it is part of the family trust, because there is a family trust that was created by Mr. Tortora, his brother and his siblings, his sisters, and that was created for the purpose of the children and the grandchildren. And the house in Jersey Shore --

THE COURT: Is this a separate trust than the trust that is in paragraph 70?

MR. LEVIN: It's a real estate trust.

THE COURT: No, it is a separate trust.

MR. LEVIN: I have to look at paragraph 70.

THE COURT: Here, paragraph 70 says that it's a grant or a trust irrevocable grant or trust for the benefit of his daughter, the mother of his daughter, and future grandchildren. It's funded with a rental property. Trust income is reported on his tax returns, as is appropriate to a grant or a trust.

MR. LEVIN: It is the same, Judge. It is the same trust.

THE COURT: Are there more than one brother here? Because it says his brother, Anthony Tortora, is the independent trustee. He wouldn't be a beneficiary of the trust, I don't think, although --

MR. LEVIN: No, his brother is the trustee. He's not a beneficiary. Beneficiaries are the children of the four siblings.

THE COURT: I see. So the house, the reason it's not on the financial statements is it's owned by a grant or trust for the benefit of his children, grandchildren, and the mother of his daughter, is that correct?

MR. LEVIN: Correct, and his brother and sister's children as well.

THE COURT: I see. That's the house, the picture you showed me, which is a modest house. That's the corpus of the trust?

MR. LEVIN: It's part of the real estate. There is also a home in Southern New Jersey, which is a nicer home, owned by all of them. But that is the home that Mr. Tortora lived in for the past 30 some odd years.

THE COURT: And in the trust, it has the home that he's lived in for 30 some odd years.

MR. LEVIN: It has all the real estate that is owned

by, that was previously owned individually by different family members.

THE COURT: What does that consist of apart from the nicer home in New Jersey that is listed in his home? Is there additional --

Sir.

MR. LEVIN: I understood the question.

THE COURT: I haven't stated the question.

MR. LEVIN: OK.

THE COURT: Is there additional corpus to that trust?

MR. LEVIN: I believe there are either one or two, two family homes in Yonkers.

THE COURT: One or two family homes?

MR. LEVIN: In Yonkers, rented out to people.

THE COURT: Well, it seems to be throwing off a fair amount of income, or at least he has the ability to take it down. Because in 2016, his AGI, his adjusted gross income was $263,000.

MR. LEVIN: I'm sorry. What year are you referring to, your Honor?

THE COURT: 2016, on page 13 of the presentence report.

MR. LEVIN: Your Honor, that was before his arrest and when he was working full-time. He isn't working at all right now.

THE COURT: That's a fair point. When was he arrested?

MR. LEVIN: August 2, 2018. He spent 21 months in prison, a year of house arrest. For the past nine months or ten months he's been allowed to --

THE COURT: Sir, in 2017, he was also working then and that's when he made $93,000. Are you telling me, sir, that no part of 2016, 2017, or 2018, income was a distribution from the corpus of the irrevocable trust?

MR. LEVIN: To be perfectly honest, I don't know if part of that is a distribution. I do know that he was working full-time up until the time he was arrested.

THE COURT: It certainly represents rather sophisticated estate planning.

MR. LEVIN: Your Honor, I'm advised by my client that there is no distribution that goes to him from the trust at all.

THE COURT: Because paragraph 70 says, according to the trust attorney, Tortora has no right to withdraw any trust assets, nor any right to distributions. But what it does not say is whether or not under the trust instrument he has the ability to receive trust assets or distributions.

MR. LEVIN: I've been informed that he does not. My client does not have the ability to touch that trust. He does not receive distributions.

THE COURT: The question is slightly different, but my guess is you don't know, because his brother is the trustee. He's hardly independent. It calls him an independent trustee. He may be independent technically, but as Mr. Tortora's brother, he's not independent over his decision-making.

All right. Go ahead.

MR. LEVIN: To finish up and not to get distracted on what I believe to be a collateral issue, and it's my fault for bringing it up.

THE COURT: No, you were raising a fine issue. It does seem to me that a fine is appropriate because there are a number of significant holes in this financial information on pages 12, 13, and 14. You've plugged some of them by saying that the house where he's lived is part of a trust. And, again, I think it's excellent that he's had such sophisticated estate planning advice that would lead him to sit up in a revocable donor trust.

Go ahead, sir.

MR. LEVIN: Your Honor, in conclusion, it comes down to this. Mr. Tortora is not a healthy man, as set forth in all our submissions. He has very serious comorbidities. Sentencing him to imprisonment, in all likelihood, could be a death sentence.

If the court is considering a sentence above and beyond 24 months, I would respectfully request that this court

sentence Mr. Tortora to house arrest or home detention for another year.

As I told the court earlier, I don't want to belabor it. The average sentence for this type of conduct, he's already served the sentence 21 months. The sentences that have been handed out --

THE COURT: No. That's the conduct on Count One, as I understand it. That's what you told me.

MR. LEVIN: That's correct.

THE COURT: He's pled to two separate counts.

MR. LEVIN: The gambling count is not a case that routinely or ever results in a significant jail sentence. As the grouping rules pointed out, it's disregarded totally for purposes of sentencing in this particular case, but that's my deal.

THE COURT: All right.

MR. LEVIN: In a nutshell, and then I'll sit down, Mr. Tortora has paid severely for his crime already. 21 months of incarceration under horrendous conditions, his inability to get medication, his inability to take care of his daughter. She is here today.

One last fact, to show the court the type of person Johnny Tortora is, when he got out and came home, he got his daughter on track. She went back to college, finished her education, and graduated --

THE COURT: I saw she wanted to be a nurse. Has she succeeded and has she finished nursing?

MR. LEVIN: She has a four-year degree from Montclair State and is presently working in banking and finance.

THE COURT: Wonderful.

MR. LEVIN: Secondly, she is healthy, thank God. We're not going to reiterate what's already in the submissions, but Johnny was able to help her turn her life around. They have a symbolic relationship. They are mutually dependent on each other. They've been this way for her entire life. I will let Serena address the court in more detail about that.

In conclusion, your Honor, I'm requesting that the court consider, since the court seems to think a jail sentence is appropriate, that the court consider house arrest for another year.

THE COURT: All right. Thank you.

Let me ask, just looking at some of this with what you've told me in mind, and it's very helpful, but you said he was working in 2016 when his AGI was over $250,000. Paragraph 64 states that, basically, he hasn't worked since 2013 because he's disabled due to a stroke he suffered in 2013.

MR. LEVIN: He continued to work part-time, but he was not working full-time after the stroke in 2014. So for the following two years, he was working part-time.

What is significant for the court to understand in

business, as your Honor I'm sure is aware when you were in private practice, your income varies dramatically year to year based on the volume of business.

THE COURT: All right. Thank you. I appreciate it. It's very helpful.

MR. LEVITT: Your Honor, I know you only wanted one of us to speak, but if I could just have a brief moment to make two very short points, your Honor?

THE COURT: Go ahead, sir.

MR. LEVITT: Thank you so much. Thank you for indulging me, your Honor.

THE COURT: I always have, sir. You know that.

MR. LEVITT: I do. Judge, I want to propose respectfully a way to look at obstruction of justice and to directly address the guidelines with respect to obstruction.

As the court knows, the reason that the guidelines are as high as they are for obstruction is because of the cross-referencing provision. Where the obstruction involved a criminal case, the court is directed to look at the guideline for accessory after the fact.

Well, here, because the guideline was driven by the fact that the grand jury was investigating a murder, the base offense level rose from what it would have been all the way up to 30, which is the maximum that it can be for obstruction of justice.

But I respectfully suggest that that is a wrong way to look at the gravity, the severity of, the moral turpitude of obstruction of justice, because the guidelines don't care whether or not the defendant had any idea what kind of investigation he was obstructing. Yet that is driving the guidelines here.

If, in fact, the guidelines, as I think properly they should, increase the severity of the base offense level based upon what the defendant knew, then in this case, there would be no adjustment whatsoever to the base offense level for obstruction of justice because he didn't know. There is no claim that he knew.

In fact, the subpoena that the court has in front of him, your Honor, simply says it was an investigation under 18 U.S.C. 1962, which as the court knows is RICO and which covers a huge amount of territory, including gambling offenses, for example. Nobody would have known and there is no way that Mr. Tortora would intuit that this subpoena had to do with a murder investigation.

THE COURT: I think that's a fair point. I would want the government to respond.

MR. LEVITT: Thank you, your Honor.

If, in fact, the court viewed the issue of moral culpability IN that sense, the base offense level would only be 14. And even when you add an additional point for the

gambling, that would bring you up to 15. But then you would go down two points for acceptance of responsibility and you would end up with 13. With criminal history category II and a final offense level of 13, the guidelines level would be 15 to 21 months, and that includes the gambling, your Honor.

So I simply ask that the court consider viewing this with respect to the actual moral culpability of a defendant such as Mr. Tortora who obstructed justice, no doubt, but certainly didn't believe and had no reason to believe that this was with respect to a murder investigation, let alone the fact that, in reality, it didn't in any way obstruct the investigation because the police already knew that Mr. Pagano was the person who would have been depicted in the video.

So was it wrong? Yes. Was it criminal? Yes. But there were grades of criminality and grades of moral turpitude, your Honor, and this most respectfully, I believe, for obstruction, is at the lowest end of that.

The other thing I would like to bring to the court's attention, if I may, the court had suggested that if it sentenced Mr. Tortora to additional time, it would not have him surrender to the MDC, but rather to whatever was the designated institution.

THE COURT: He would be self-reporting.

MR. LEVITT: Yes, your Honor.

The problem with that in the age of COVID is there is

absolutely no way of knowing whether or not an institution which today is COVID free will be COVID free tomorrow or the next week or the week after that.

If I may just hand the government and the court one piece of paper, your Honor?

THE COURT: The issue wasn't so much the presence of COVID at any particular institution, because they vary. They are publicly recorded, of course, but they do value. It was concerned about the particularly difficult conditions at the MDC as publicly reported that is reflected in that ongoing class action.

MR. LEVITT: Yes, but I would also say there is class actions at numerous other institutions, and numerous other institutions have been hit just as severely by COVID. What I just provided to your Honor is a graph that we keep in our office, and we have kept since the beginning of COVID, and the court will see the number of positively testing inmates at any given time. And as the court will see, during the last just two weeks, we have reached levels that the BOP has never reached before.

THE COURT: Now, I have seen your firm in public media responses to COVID in BOP facilities, but is the information underlying this publicly available or is this something that your firm has developed?

MR. LEVITT: No, it is publicly available. And I

would say that on our website, we have a link to the BOP daily information concerning COVID in the prisons. The problem --

THE COURT: I'm sorry. It's a slightly different question. It's not whether you can substantiate these numbers based on aggregating things from the BOP, it is whether or not these numbers exist in some form outside of your office.

MR. LEVITT: Sure. Yes, they exist on the BOP website. All these statistics are taken from the BOP website exclusively.

THE COURT: So this chart I can find on the BOP website?

MR. LEVITT: No. What you can find is the numbers that correspond. For example, when you see at the far right of the graph that approximately 10,500 inmates and staff are positively testing for COVID at the current time, when you go on the website, you will see the numbers that add up to that.

THE COURT: I see. Thank you.

MR. LEVITT: Finally, your Honor --

THE COURT: On a facility-by-facility basis?

MR. LEVITT: Yes.

THE COURT: Understood.

MR. LEVITT: Yes. But, of course, it changes constantly.

Finally, I want to thank the court not only for its indulgence, I want to thank the court for admitting Mr. Tortora

to bail. I know that the court was aware of the problems that he was having, and more importantly to him, the problems that his daughter was having, but you may not understand what that actually meant to him and to his daughter.

I don't know whether or not the court actually saw his daughter during court appearances, but I can tell you that she was gaunt, she was anxious, she was severely underweight. She had dropped out of school. She was literally at death's door. And she's going to speak in a moment, and I want your Honor to see how she is now as a result of what the court did for her.

THE COURT: All right. Thank you.

Government, what would you like to tell me?

MR. RODRIGUEZ: Thank you, your Honor.

THE COURT: Then I'll hear from Mr. Tortora, if he wishes to address the court.

MR. LEVITT: And Serena, your Honor, with the court's permission.

THE COURT: Yes. The defense has asked that the defendant's daughter address the court and I've granted that.

MR. RODRIGUEZ: Your Honor, if I may have just one more moment?

THE COURT: Of course.

(Pause)

MR. RODRIGUEZ: Thank you, your Honor.

Mr. Levin proposed one way of looking at obstruction

of justice. I would like to propose another, and I would like to respond to an issue which Mr. Levin touched on, and I think the court was interested in hearing from the government on, and that is how could Mr. Tortora have known what the subject of the grand jury's investigation was.

I believe Mr. Levin made a remark -- and I'm paraphrasing here a little bit -- that Mr. Tortora is well-known in Yonkers or something about his stature in the community. One of the things that Mr. Tortora knew at the time the subpoena was served was who was serving that subpoena and who was present for the service of that subpoena. One of the people involved in serving that subpoena was a detective in the cold case murder squad of the Yonkers Police Department. That signaled to him, and should have been a very, very important signal, this was not somebody unknown to him, that this was at least a possibility or within the scope of the government's investigation.

THE COURT: Why would he have known that this individual was in the cold case squad of the Yonkers Police Department?

MR. RODRIGUEZ: Because it is my understanding, your Honor, that this is somebody who had questioned Mr. Tortora in the past, or at least tried to, about acts of violence and murders that had happened in Yonkers.

Your Honor, at bottom, I'll focus on the obstruction

offense. This is an offense, the way I would look at it is, an offense against this court. The reason why I say that is it is well established that a grand jury is not an agent of the government, it is an arm of the court. So this was an offense against the rule of law itself.

I think the way that Mr. Levin put it was the reason why Mr. Tortora did this was that he was protecting a friend. I actually agree with that, except I'm ascribing a term of art to the word friend. Mr. Tortora was, in the '90s, an associate of the Genovese crime family. But at the time of his arrest, he had gotten his button and become a member of the Genovese crime family. That is why the government says, over that long 30-year period, he was an associate or a member. The status changed. It's not that the government is unsure. And that sentence is among the agreed-upon facts in the PSR.

So Mr. Tortora, upon receiving a grand jury subpoena, took it upon himself not to do what the law requires and comply, but rather to destroy and later fabricate evidence to protect himself and Danny Pagano, who had been convicted before Judge Abrams of a racketeering offense relating to his involvement in the Genovese crime family.

Your Honor, this was a very, very serious offense. Now, even if your Honor does not agree with the sentencing recommendation of the government, and to be crystal clear, the government readily acknowledges the wide discretion that the

court has in arriving at an appropriate sentence here.

THE COURT: Well, the recommendation of the probation department on a guideline range of 78 to 84, which is the agreed-upon guideline range, is 60 months. That is what the probation department is seeking.

MR. RODRIGUEZ: I understand, your Honor. And candidly, that would not be an unreasonable sentence even though it is a sentence lower than what the government is asking for.

Among the other factors that the court has to consider, your Honor, is the need to promote respect for the law and to afford adequate deterrence. And the court has already touched on Mr. Tortora's criminal history, so I won't go over that again. But there is one point that would I like to emphasize and, perhaps, it is obvious.

There is quite a few people in the courtroom here today, your Honor. The people who are here today, when this sentencing is over tomorrow, next week, next month, next year, they are going to talk about it. They are going to talk about it with other members of the community, and they are going to talk about the court's sentence. And they are going to talk about whether that sentence appropriately captured the seriousness of the offense or whether this kind of crime is nothing to worry about, it's something that you can be sentenced for and simply get time served.

So, your Honor, the government respectfully submits that the court's sentence should not send that message.

THE COURT: Well, let me, for the moment, take the defense view, and there is time served and time served. In other words, the defense would say the man has already served 20 months under very difficult conditions.

MR. RODRIGUEZ: Your Honor, I'm not here to defend the conditions of the pretrial conditions of confinement. I think the court knows about them, perhaps better than I would, and it would certainly be within the court's discretion to give Mr. Tortora some amount of credit. The question, of course, is how much.

But by my math, maybe I have this wrong, but Mr. Tortora was arrested on August 2 of 2018, and then released on bail on March 20 of 2020. I have that as shy of 20 months, which would be approximately 25 percent of the bottom of the applicable guideline range, which is a very considerable haircut. And I know there was a lot of conversation by the defense about what is the average or what is within the 96th percentile.

I'm not going to belabor that point too much, your Honor, only because as the court knows, every case is different. Every case presents its own set of facts. We don't know how many of those cases involved, like this one, the obstruction of the grand jury investigation into a murder.

Your Honor, also, two other points that I'll address. One is the issue of a fine. The government is not pursuing some novel legal theory here. This is, in fact, the approach that the guidelines call for. The guidelines say that the court should impose a fine in every case except in those cases where the defendant has carried his burden of showing that he is not now, nor will he be able to in the future, pay any underlying reward, underlining fine even under an installment plan.

Your Honor, I submit Mr. Tortora has not carried his murder in that regard. The record indicates, I think your Honor put it well, there are a number of holes in the record. So to the extent that there are holes, it is for Mr. Tortora, not the government, because it is his burden to plug those holes. I submit that he is not able to plug those holes, your Honor, such that a fine is appropriate here.

Finally --

THE COURT: Specifically, what are you referring to?

MR. RODRIGUEZ: Well, I think in terms of the holes in the record, your Honor.

THE COURT: In terms of the unlikeliness of the reality of this financial statement. Let's put it at that.

MR. RODRIGUEZ: Well, a few things, your Honor. Again, it raises questions, I think the way your Honor put it was, is this the product of very good and well-advised estate

planning. What I'm suggesting is that there could be another reason.

I think what I stated in my sentencing submission is that it could be deliberately designed to avoid the payment of criminal penalties, and that is Mr. Tortora's burden to show. I'll just touch on a couple things.

As I understood it, and maybe I misunderstood Mr. Levin, by 2016, as I understood it, he said Mr. Tortora had been working part-time because it was around 2013 when he suffered his injury.

MR. LEVIN: Summer of 2014.

MR. RODRIGUEZ: Mr. Levin says summer of 2014. Yet the reported income from 2016 on a part-time work basis was $263,000. So it raises the question as to what the income would have been on a full-time basis.

Your Honor, I mentioned this in my sentencing submission, and the Second Circuit has made clear that it is entirely appropriate for the court to consider, which is that Mr. Tortora is not indigent. He is not represented by court-appointed counsel. He has been able to afford not one, but over the course of this case, six highly regarded prolific attorneys who work in these kinds of cases in the New York area. The Second Circuit is crystal clear that this is strongly indicative of the defendant's ability to pay a fine.

THE COURT: Well, it does raise the issue from how he

was able to afford those attorneys on this financial statement that says he has a total monthly net cash, positive cash flow of 3,000. That's true.

Now, he also had posted for on his behalf a $2 million bond secured, I take it, by whatever the bonding agency required. When I raised that issue, I was told he had friends who were willing to support him. Seems to me that that is most likely true. Somebody else put up the money for the $2 million bond.

MR. RODRIGUEZ: That does appear to be the case with respect to the bond, your Honor. We don't know what the case is with respect to his engagement of counsel. The record is silent on that. He has not carried his burden on that, and the Second Circuit has said, in those kinds of circumstances -- I'm not suggesting anything nefarious about it, I'm simply suggesting that this indicates his ability to pay a fine.

Then finally, your Honor, with respect to the surrender date. I think your Honor is entirely correct that one of the ways in which the court can mitigate some of the concerns here is by having Mr. Tortora self-surrender to a facility. The government would certainly have no objection to that. It would even have no objection, we could take it a step at a time, if the court felt like a longer period of time was appropriate, more so than usual, within reason. I'm sure that that would be appropriate.

Of course, I don't think it's been said, but as I understand it from the papers, Mr. Tortora is vaccinated against COVID-19. And as we know, vaccinations work in preventing the development of serious symptoms or death from COVID-19.

So, your Honor, with that, unless the court has any questions.

THE COURT: Yes. Tell me a little more -- I think I have it well in hand, but I want to hear more specifically about both the obstruction itself and the interstate transportation of wagering information over a 21-year period.

In the view of the government, I have the barebones of it, on the plea agreement itself -- not the plea agreement, I'm sorry -- the guilty plea, Mr. Tortora stated with regard to Count Two -- and this is on page 29, document 103 -- with regard to Count Two, between 1997 and 2018, I and one or more persons being engaged in a sports betting business used a telephone for interstate transmissions of information related to the business. This occurred in the Southern District of New York.

What is the submission of the government in regard to that?

Is this a man taking sports bets on legitimate games?

Is this a bookie?

What is the government's position?

MR. RODRIGUEZ: Your Honor, I'm not quite sure what the difference between those two is, but I would say the following.

Mr. Tortora, as reflected by his guilty plea, was involved in illegal sports betting. He ran a sports book. I think the term bookie is a bit loaded. I don't want to put anything before the court that is not properly at issue in this sentencing. But --

THE COURT: Fair enough. Let it go at that.

MR. RODRIGUEZ: Yes.

THE COURT: All right. Because I don't want to import into the plea to interstate transmission of wagering information more than there is and, apparently, we don't have information in that regard.

Go ahead.

MR. RODRIGUEZ: I think your Honor wanted to hear some more about the obstruction of justice.

THE COURT: Yes. Because on one hand, Mr. Levin says he's protecting a friend and he didn't draft the document and it was all for a good cause. It was like helping people, which this man has done.

MR. RODRIGUEZ: A few responses to that, your Honor, and I think some of this has come out, but just to bring it all together. He was helping a fellow member of organized crime. Mr. Pagano was on supervised release before Judge Abrams.

One of the standard conditions of supervised release is for Mr. Pagano, that you may not associate with known felons, absent the permission of your probation officer. At the time of this incident, Mr. Tortora was, I believe, a convicted felon, and so had there been evidence of the two of them together, that would have been a violation of Mr. Pagano's term of supervised release.

But here is why that video is actually very critical to the government's investigation. One of the original --

THE COURT: The video that was erased?

MR. RODRIGUEZ: Correct. That is why it is important to understand it as evidence of the murder in federal court.

One of the elements of the crime that was originally charged was that Mr. Tortora was a member or associate of the Genovese crime family and we would have had to prove that beyond a reasonable doubt at trial. This video is evidence of that. As the court probably knows from presiding over these kinds of trials, it is frequently the case -- especially when there is an organization like La Cosa Nostra, that is very conscious of avoiding detection, that evidence and persuasive evidence can be in the form of just people being together who shouldn't be together.

So this would have been direct evidence of an element of the murder charge that the government ultimately brought but is no longer pursuing. So Mr. Tortora gets the subpoena that

agent and detectives served him with the subpoena, asked to download the materials right away. Mr. Tortora declined. Time went by, and eventually he had time to delete the materials.

He says that he was going to have his IT guy, you know, download the materials. Instead what he does is, he has his IT guy provide this blank document, either he or someone who he causes to draft the document, the contents of which are false. And he persuades the person referred to as witness one in the PSR to sign it, even though that person said that when he inspected the video, it wasn't malfunctioning, the system wasn't malfunctioning in the way that this letter says. The video had just been deleted.

So that's the thrust, your Honor, of the obstruction.

THE COURT: All right. Thank you.

MR. RODRIGUEZ: Thank you, your Honor.

THE COURT: Mr. Tortora, you have the right to address the court, sir. You don't have to say anything at all. Anything you say may be used against you. If you wish to speak, I'm here to listen to what you want to say.

MR. LEVIN: Your Honor, may we have his daughter speak first, Serena?

THE COURT: If you wish.

MR. LEVIN: We do. Thank you.

MS. SERENA TORTORA: Hello. Good morning.

Thank you, your Honor, for giving me the opportunity

to speak today. I'm John Tortora's daughter and only child. I don't know what effect, you know, my speaking will have on your decision today, but I would just like to give you a better understanding of, you know, who I know him to be and how this, the entire ordeal has affected myself as well as my family.

THE COURT: Now, I assume your father's attorneys have told you that there is really no right for family members to speak at a sentencing. The rights are in the Crime Victims Act where crime victims have a right to speak. And you can imagine that I would be inundated with friends and family members who want to speak on behalf of defendants.

Nonetheless, because your health and well-being has been a factor here in the various bail applications, in fact, you submitted a declaration earlier, about two years ago now in March of 2020, in which you asked to be able to spend time with your father before sentence is imposed. And as I say, that was two years ago, so I'm certainly glad that you've been able to do that.

In light of the fact that your health has been a factor in this proceeding in terms of bail and sentencing, and there was a specific request from defense counsel to allow you to speak, I've done that.

So why don't you proceed.

MS. SERENA TORTORA: Thank you, your Honor.

I just -- yeah. It's completely apparent that when he

was arrested, I was not in good health at all.

THE COURT: No. I was glad to see you had completed college.

MS. SERENA TORTORA: Yes.

THE COURT: I think in one or more of the letters, I thought you might want to go into nursing. Sounds like you're now in banking. Sounds like you're well on the way to recovery. That's good.

MS. SERENA TORTORA: Yes, your Honor. Thank you.

I have come -- to me, I've made a complete transformation since that period, which was a very dark period for me. I began spiraling and I had many health issues, and it's not an exaggeration when I say that I was close to death many times during his arrest. And I was, you know, this entire ordeal was shocking to me. You know, he's my biggest support system that I have.

THE COURT: And I hope your drug problems are behind you as well?

MS. SERENA TORTORA: Yes, your Honor.

THE COURT: Excellent. Excellent. That's all important.

MS. SERENA TORTORA: Thank you. Thank you.

And I have -- I've graduated from Montclair State University in the spring, and I'm just doing immensely better now that, you know, these things are behind me.

So it's, you know, helped me. And I would like to thank you for releasing him when you did because, also, with the pandemic that we've been encountering, that was also a very difficult and scary time for me. I've had a lot of anxiety over what could happen, you know, with his health since he's had a stroke, and his memory has been declining substantially. It's been causing me severe anxiety. And still to this day, I have anxiety worrying about, you know, whether he will get sick. And, you know, it's just the thought of him going back into -- back into prison would just -- it just terrifies me, frankly.

THE COURT: I understand.

MS. SERENA TORTORA: So, you know, I have overcome all these obstacles since he's been home. You know, we do everything together. We work together, we live together, and our reliance and support upon one another is mutual. So, you know, I do things for him. I cook for the both of us, you know. I remind him to take his medication. You know, it's a mutual relationship, your Honor.

And, you know, it's very difficult to be this vulnerable and, you know, kind of come out with all these obstacles that I've had to face while he was incarcerated. But I just want you to understand the seriousness of how it has affected, you know, both myself as well as him and my family.

So, you know, like I said, he is the strongest support

system that I have. And I just fear that, you know, there is a lot of things, especially with his health, that is one thing that I fear most, you know, because of rising number of cases. And, you know, he is vaccinated, but obviously, as we can see, that's not really making a difference in the number of cases. There is still a lot of people getting sick even though they are vaccinated. That's kind of irrelevant in my opinion, the fact that he's vaccinated.

Lastly, I would just like to thank you for allowing me to speak. I know, you know, you didn't have to do that. Um, and I do feel a little bit guilty because I wanted, you know, I begged my father not to take a plea and not to plead. I know that is irrelevant, but I begged him not to do that because I really wanted him home. I was scared for his health and his safety. And, you know, he really wanted to prove, you know, his innocence and everything else in this case, and I really wanted him to come home. So, you know, I do feel guilty about that.

But, you know, I just hope you can take it into consideration the type of person he is. I've known him longer than anybody else and I'm closer to him than anyone else over the past 26 years. And the way he's been portrayed is not at all accurate to the way he actually is.

So I just hope you can take all these facts into consideration when you make your decision, and thank you for

letting me speak.

THE COURT: No, thank you. I think you should be congratulated for the progress you've made, and I certainly do intend to take into consideration all of the factors here.

MS. SERENA TORTORA: Thank you. Thank you, your Honor.

THE COURT: After speaking, Mr. Tortora, if you wish to speak to me, now is your opportunity.

THE DEFENDANT: Yes, your Honor. I just want to use this note because I have a problem remembering.

THE COURT: Of course.

THE DEFENDANT: First of all, I want to apologize why we're all here today. I'm sorry for the fact that we're here. I want to thank my family. I want to thank my family for helping me with the finances to pay my attorneys. I want to thank my friends who put up their properties for me. I want to thank them for that. I want thank my lawyers working so hard on my case.

Also, I just want to reiterate, your Honor, that I'm not in any organized crime. I have nothing to do with organized crime. These are people I grew up with, and I was just listening to them talk before. And I'm not in any organized crime. I have no captains. And I haven't even gotten a parking ticket in 20 years. So I don't know why, you know, we're saying how career criminal I am.

Also, the most important thing, your Honor, is I want to thank you for getting me on bail to come out and help my daughter at the time you did because, as you know, she is doing good today. I want to thank you. When I got incarcerated in August, she was almost 88 pounds. I weigh her every day, your Honor. When I came home, she was 72 pounds.

THE COURT: I read all that information, and she has very close calls involving Narcan and resuscitation and so forth.

THE DEFENDANT: She also now is 90 pounds, your Honor. So what I'm trying to bring out is, I just feel I have to be home to take care of her. And, you know, that's all I wanted to say. Thank you.

THE COURT: Thank you, sir. Give me a moment here, please.

(Pause)

Let me tell you the sentence that I intend to impose, and then I will impose it.

The guideline range here is 78 to 84 months. I am going to vary downward. I'm going to sentence this man to 48 months' incarceration. He's already served 20, but he is going to have to serve the balance of that time. That's a substantial variance from the 78 to 84-month guideline.

The crimes here were very serious, especially the obstruction of justice, which was very knowingly made and

simply involved manufacturing documents, or having them manufactured on his behalf, and totally misstating what the facts were. And he knew it was in an official proceeding, specifically a grand jury from the Southern District of New York.

Supervised release is going to be two years on Count One and one year on Count Two, to run concurrent. I am going to impose a $60,000 fine payable over one year, at $5,000 monthly installments, because I find that financial information is barely credible. No restitution. Special assessment of $200. The standard mandatory and special conditions recommended by the probation department.

Before I formally impose sentence, are there any formal objections the defense wishes to lodge, Mr. Levitt?

Mr. Levin, I'm sorry. Once again, I have confused the names.

MR. LEVIN: Your Honor, it's not a formal objection, but I would ask your Honor to consider that the 28 months that he has to serve be in house arrest and not sending him to an institution.

THE COURT: Thank you. I have considered that.

Government, any formal objection?

MR. RODRIGUEZ: No, your Honor.

THE COURT: All right. Mr. Tortora, if you would rise, sir.

I hereby find the total offense level is 27, the criminal history category is II, the guideline range is 78 to 84 months. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this court that the defendant, John, Tortora, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 48 months.

Upon release from imprisonment, Mr. Tortora shall be placed on supervised release for a term of two years on Count One and one year on Count Two, to be served concurrently with each other.

He shall serve the term of supervised release with the standard conditions set forth in pages 24 and 25 of the probation report, and with the mandatory conditions set forth on page 24 of the probation report.

The mandatory conditions are he shall not commit another federal, state or local crime;

You shall not illegally possess a controlled substance;

You may not possess a firearm or dangerous weapon or destructive device.

I am going to suspend the mandatory drug-testing requirement on the finding that Mr. Tortora poses a low risk of future substance abuse.

As I say, he shall comply with standard conditions 1 through 12, as set forth on pages 24 and 25 of the probation

report, and he shall also follow the special conditions set forth on pages 25 and 26 of the probation report.

Within 72 hours of release of the custody of Bureau of Prisons, he shall report in person to the probation office in the district to which he is released.

I am imposing a fine. United States Sentencing guideline 5D1.2(a) states, "The court shall impose a fine in all cases except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." And I find that the defendant has not established that. The guideline fine range here is 25,000 to $250,000, and as I said, I intend to sentence this defendant and fine within the guideline range. The applicable factors for a fine are set forth in 18 U.S.C. 3572(a), and those factors when applied by me support the imposition of a fine.

Factor one is considering the defendant's income earning capacity and financial resources. I believe Mr. Tortora has the ability to pay a fine. He has a net worth, as set forth in the financial information, of $57,000 and a monthly net cash flow after expenses of over $3,000. Those are the findings of fact as set forth in the paragraph 67 of the presentence report. The probation department has also found that he has the ability to pay a fine. That's the presentence report on paragraph 71.

Factor two in Section 3572(a) is to consider the

burden and finally impose upon the defendant for any person who is financially dependent on the defendant. The only burden here is to the defendant that I find it is an appropriate one. He's already funded an irrevocable trust family members, certainly suggests that at some point he had substantial assets. And it is a little unclear what the total corpus of that trust is, or for that matter, whether or not he has the ability to request his brother to release assets of the trust for his benefit. What I've been told is that he has no right to distributions. That, I can understand. I don't know whether he has the ability for his brother to direct that there be releases from the trust.

But that's not what is critical here. Again, he does have, or had assets, and he has no call on his earnings, especially when he is incarcerated. But he simply has the cost of running the house, which he owns, but is not on his financial records for the reasons set forth. There is no one who is financially dependent on him. He has one exemption in his tax returns, according to the information, and that I presume is himself.

Factor six is to consider the expected cost to the government of any imprisonment or supervised release and the expected monthly cost to the government as set forth in the presentence report in paragraph 84 over $3,000 for monthly costs for imprisonment and $373 for supervised release.

I do find that the 60-month, $60,000, is appropriate, and I set the installment schedule at $5,000 a month starting 30 days from the signing of the judgment in this case.

I'm not imposing restitution because there is no victim pursuant to 18 U.S.C. 3663.

I will order Mr. Tortora to pay to the United States a special assessment of $200, which is due immediately. I have sentenced this defendant below the guideline range on a variance basis taking into consideration such matters as the difficult conditions when he was in the MDC and his health.

These crimes, I repeat, were very serious, especially the obstruction of a federal grand jury proceeding investigating a murder. I do believe the sentence is appropriate given the extreme seriousness of both counts and the need for punishment and deterrence.

I've indicated already that I don't intend to remand Mr. Tortora here. I am going to have him stay out for five weeks.

Ms. Blakely.

I direct that Mr. Tortora surrender for service of sentence at the institution designated by the Bureau of Prisons on or before 2:00 p.m. on February 25, 2022.

Mr. Tortora, I'm going to keep you out, as you heard, because I do want you to be able to self-surrender. I think that's to your advantage. But you have to continue to abide by

all the conditions of your release as you have up to now.

Do you understand that, sir?

You have to say for the record.

THE DEFENDANT: Yes, I do. Yeah, yeah.

THE COURT: Thank you.

Mr. Levin, are you aware of any legal reason why the sentence should not be imposed as I have stated it?

MR. LEVIN: No, your Honor.

THE COURT: Government?

MR. RODRIGUEZ: Your Honor, one just request for clarification. The 48 months, is that 48 months on --

How does that break down between the two counts?

I suppose it is the question as to the court's intent.

THE COURT: It's 40 months on both concurrent. Count One and Count Two is concurrent.

MR. RODRIGUEZ: Thank you, your Honor.

THE COURT: All right. Just a moment.

(Pause)

MR. LEVITT: Excuse me, your Honor. I believe Count Two is a two-year max. I don't think it can be 48.

THE COURT: I'm sorry. Thank you, Mr. Levin. Thank you very much. It is absolutely right.

The statutory provision on Count One is zero to five years and on Count Two is zero to two. I appreciate that. So on Count One is 48 months, Count Two is 24 months, concurrent.

All right. That's an important change.

MR. LEVIN: Your Honor, may I make a request?

This is Mr. Levin speaking.

THE COURT: Let me ask a question first.

I assume there is a limited waiver of appeal rights in the plea agreement, and I assume it's 78 to 84, is that correct, Mr. Levin, Government?

MR. RODRIGUEZ: That's correct.

MR. LEVIN: Yes, your Honor.

THE COURT: Mr. Levin, what's your request?

MR. LEVIN: My request is to grant Mr. Tortora additional time to surrender.

Twofold. One, the agency, we're still dealing with the severe numbers with COVID, the variant. For all the reasons expressed in our presentation with his current medical issues, it would probably be safer if he could surrender in the spring, April or May.

Secondly, five weeks is not exactly enough time for him to make arrangements for his daughter, for himself, and get a plan in place.

THE COURT: The request is denied. It's time. This sentence has been pending for a considerable period of time. It does not make sense to wait until the end of the pandemic.

Mr. Levin, are you aware of any legal reason why the sentence should not be as I have stated it?

MR. LEVIN: No, your Honor.

THE COURT: Government?

MR. RODRIGUEZ: No, your Honor.

THE COURT: I hereby order the sentence to be imposed as I have stated it.

Mr. Tortora, you have the right to appeal the sentence I just imposed on you. If you cannot pay the cost of an appeal, you have the right to apply for leave to appeal *in forma pauperis*. I do wish to inform you that in your plea agreement, you agreed to waive the right to appeal the sentence and you agreed to waive the right to collaterally attack the sentence if I sentenced you to 84 months or below. Indeed, I've sentenced you to basically a little more than 50 percent of that.

Do you understand your appeal rights, sir?

THE DEFENDANT: Yes, I do.

THE COURT: If you do wish to appeal, all you have to do is ask the Clerk of Court to prepare and file a notice of appeal on your behalf immediately. But similarly, you can ask your attorneys to file a notice of appeal on your behalf, and Mr. Levitt and Mr. Levin, if your client does request you to file a notice of appeal, I direct you to file that notice of appeal.

You both understand that, correct?

MR. LEVIN: Yes, Judge.

MR. LEVITT: Yes, Judge.

THE COURT: Do you understand your appeal rights?

THE DEFENDANT: Yes, your Honor.

THE COURT: Any open counts here?

MR. RODRIGUEZ: There are, your Honor.

The government would move to dismiss all open counts with respect to Mr. Tortora.

THE COURT: All right. Granted.

Mr. Tortora, I don't really think there is anything I need to tell you. I think you fully understand what you've done. You've pled guilty. I've told you, I think this is a very, very serious crime. In light of all the circumstances here, I think I've sentenced you rather leniently.

What's important, and you know it as well as I do, is use your time as effectively as you can while in prison. Maintain close communication with your daughter, as I'm sure you will.

When you get out, just lead a completely law-abiding life. Some of your friends are probably not really your friends, but that's up to you to determine.

All right. Thank you.

MR. LEVITT: Judge, one more thing, your Honor.

THE COURT: Please.

MR. LEVITT: I would ask the court to recommend to the Bureau of Prisons that Mr. Tortora be designated either to

Otisville camp or to Fairton camp, both of which he is eligible for and which are reasonably close to New York.

THE COURT: I think you know, Mr. Levin, I don't recommend designations to particular institutions, but I will recommend that this defendant be housed in the Tri-State area in order to facilitate family visits.

Thank you.

(Adjourned)